Peter WEISS, on behalf of himself and all other persons similarly situated, and Lillian Robinson, on behalf of herself and all other persons similarly situated, Plaintiffs-Appellants,

v.

J. J. DUBERSTEIN et al., Defendants-Appellees,

Louis J. Lefkowitz, Attorney General of the State of New York, Intervenor-Appellee.

No. 792, Docket 71–1018.

United States Court of Appeals, Second Circuit.

Argued May 14, 1971.

Decided July 20, 1971.

John Dewitt Gregory, New York City, Community Action for Legal Services, Inc. (Lawrence J. Fox, New York City, of counsel), for plaintiffs-appellants.

Samuel A. Hirshowitz, First Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of the State of New York and Robert S. Hammer, Asst. Atty. Gen., of counsel), for intervenor-appellee.

Before FRIENDLY, Chief Judge, WATERMAN, Circuit Judge, and ZAVATT, District Judge.*

ZAVATT, District Judge:

The plaintiff Peter Weiss sues as a member of the Democratic County Committee of Bronx County and also in behalf of the class consisting of members of the Democratic and Republican County Committees of Bronx, Queens and Richmond Counties. The plaintiff Lillian Robinson sues as a resident of Bronx County and a duly registered member of the Democratic Party and also in behalf of the class consisting of all registered Democrats and Republicans of Bronx, Queens and Richmond Counties. Both plaintiffs appeal from the order of District Judge Frankel of the Southern District of New York, dated and filed October 5, 1970, denying their motion for summary judgment in a class action seeking a judgment declaring unconstitutional § 31 of the New York Election Law.[1]

---

* Of the District Court for the Eastern District of New York, sitting by designation.

1. § 31. Recommendations for appointment of commissioners of elections

At least five days before the first day of January in each odd numbered year, or in each alternate odd numbered year if the term of office of commissioners be four years, the respective chairman of the county committees within the counties of New York and Kings, and, except as otherwise provided in this article, the respective chairmen of the county committees of all the other counties in the state, of each of the two political parties which at the general election last preceding the date of such certificate cast the highest and the next highest number of votes for governor, shall each respectively make and file in the case of the counties of New York and Kings with the city council of the city of New York, and in the case of each of the other counties with the board of supervisors of such county a certificate in substantially the following form, each of which certificates shall certify the name of a person who is a resident and qualified voter, in the case of the counties of New York and Kings, of the city of New York, or in the case of the other counties a resident and qualified voter of the county, and who is recommended as a fit and proper person to be appointed a commissioner of elections: "I, ................, chairman of the county committee of the ................ party, for the county of ................ do hereby, in accordance with the provisions of the election law, certify that in the opinion of a majority of such committee, pursuant to a resolution duly adopted, ..............., a resident and qualified voter of the borough of ......... city of New York, or the county of ................, is a fit and proper person to be appointed a commissioner of elections, and I do hereby recommend him for appointment to such office.

The complaint is grounded in 42 U.S.C. § 1983 and attacks the state statute as violative of the Equal Protection Clause of the Fourteenth Amendment to the Constitution. It is their contention (1) that § 31 deprives the Republican and Democratic County Committees of Bronx, Queens and Richmond Counties of the right to certify party members for appointment as commissioners of the New York City Board of Elections by the City Council of the City of New York and (2) that it limits such appointments by the City Council to resident qualified voters of New York and Kings Counties, if not by the very language of the statute, in fact, by virtue of the actual practice of the City Council.

■ Judge Frankel denied the plaintiffs' motion for summary judgment (and, on November 19, 1970, plaintiffs' motion for reargument), retained jurisdiction but abstained from exercising the same in order to afford the New York Courts an opportunity to explain and definitively interpret the challenged section. Judge Frankel felt that the statute was ambiguous and that a federal court should give the state courts a chance to interpret it in a way that would save it from unconstitutionality. Since the effect of the denial of the plaintiffs' motion was to deny the plaintiffs the temporary injunction which they sought, the portion of the order directing abstention is appealable under 28 U.S.C. § 1292(a) (1).

Sections 30 and 31 of the Election Law derive from the Election Law of 1896, c. 909, § 11, sub. 2(b) pet., as added by L. 1901, c. 95, § 5. Section 30 has always provided that the Board of Elections in the City of New York shall consist of four commissioners to be appointed by the City Council; that "not more than two commissioners * * * shall belong to the same political party"; that the said Board "shall be deemed to be also the Board of Elections for each county in such city." New York Election Law (McKinney 1922, 1949, 1964). Section 31 has always provided that recommendations for the appointment of commissioners are to be made by the chairmen of the New York and Kings County Committees of the two predominant political parties, New York Election Law (McKinney 1922, 1949, 1964).

The New York Election Law was recodified and reenacted as L.1949, c. 100, § 1–342, eff. March 9, 1949. Section 31 thereof consisted of two unnumbered paragraphs. The first paragraph continued (as theretofore) to vest in each of the chairmen of the New York and Kings County Committees of the two dominant political parties the sole right to certify to the New York City Council the name of a person for appointment as a Commissioner of Elections. The second paragraph related to the filling of a vacancy in the office of Commissioner. It provided that, if the vacancy occurred in the Board of Elections of New York City and

In witness whereof, I have made and executed this certificate, this ........ day of ............, 19......" Each of such certificates shall be duly acknowledged by the person executing the same.

In counties having a population of less than one hundred twenty thousand, where commissioners are appointed for alternating terms, only the chairman of the county committee of the political party whose chairman made the recommendation for the appointment of the commissioner whose term of office expires in any year shall make and file the certificate hereinbefore provided for in such year.

If at any time a vacancy occurs in the office of any commissioner of elections,

by death, resignation, removal or inability to serve, the chairman of the county committee of the political party to which such commissioner belongs, and if he was a commissioner of elections of the city of New York and a resident of the borough of Manhattan, the chairman of the county committee of New York county, of his party, or if he was a resident of the borough of Kings, the chairman of the county committee of Kings county, of his party, shall likewise make and file a certificate in substantially the form and executed and acknowledged as above provided, recommending the name of a qualified person to fill the vacancy.

the Commissioner whose office became vacant was a resident of the Borough of Manhattan or of the Borough of Bronx, the chairman of the New York County Committee of his party shall make and file a recommending certificate with the City Council. If the Commissioner whose office became vacant was a resident of any other borough of the City, the recommending certificate was to be made and filed with the City Council by the chairman of the Kings County Committee of his party. This method of filling vacancies was a continuation of prior provisions of § 31. See New York Election Law (McKinney 1922).

During the same legislative session at which the Election Law was recodified, § 31 was amended by L.1949, c. 574, § 3, effective April 13, 1949. General Laws of the State of New York, 1949 (West Publishing Co. 1949). Reference to this amendment is made *infra*.

Not until 1970 was the first paragraph of § 30 amended to specify the residence and age qualifications of such commissioners, i. e., that they "shall be residents of the city of New York and at the time of appointment be at least twenty-one and not more than seventy years of age." L.1970, c. 678, eff. September 1, 1970.

Section 31 has provided, ever since its enactment, that only the chairmen of the New York and Kings County Committees of the two political parties which, at the last general election, cast the highest and next highest number of votes for Governor, may each certify to the New York City Council the name of a person recommended for appointment as a commissioner of elections. In fact, the chairmen of the Republican and Democratic County Committees of only two of the five counties within the City of New York may recommend persons for such appointment.

▮ While it would be possible to read § 31 as not barring the appointment by the City Council of a resident of Bronx, Queens or Richmond Counties, as a theoretical possibility, there is no ambiguity as to who may certify residents for such appointment. The limitation of the certifying authority to the chairmen of the two dominant political party committees of only two of the five boroughs raises a constitutional issue, namely, whether there is a rational basis for so limiting the certificating authority.

When this section of the Election Law was enacted, New York and Kings Counties were the most populous counties of New York City. At the request of this court, the intervenor-appellee has furnished the following comparative population statistics of all five boroughs of the City of New York for the years 1900, 1960 and 1970.[2]

| County | 1900 | % | 1960 | % | 1970 | % |
|---|---|---|---|---|---|---|
| Bronx | 200,507 | 6 | 1,424,815 | 18 | 1,472,216 | 19 |
| Kings | 1,166,582 | 34 | 2,627,319 | 34 | 2,601,852 | 33 |
| New York | 1,850,093 | 54 | 1,698,281 | 22 | 1,524,541 | 19 |
| Queens | 152,999 | 4 | 1,809,578 | 23 | 1,973,708 | 25 |
| Richmond | 67,021 | 2 | 221,991 | 3 | 295,443 | 4 |

As of 1900, Kings and New York Counties, having 88% of the total city population, enjoyed through their Republican and Democratic County Committees the

2. Letter of the Attorney General dated June 2, 1971, which also states the source of these statistics as follows: "The 1960/1970 figures are taken from the 1970 Census of Population Pamphlet PC (V1)–34 New York (U.S. Department of Commerce, Bureau of the Census, January, 1971) p. 3 Table 1, Population By Counties. According to a Bureau of the Census News release dated May 13, 1971, these figures are subject to some minor corrections. The 1900 figures are taken from Fourteenth Census of the United States: 1910; Abstract with Supplement for New York (U.S. Department of Commerce and Labor 1913) page 570. Both of these publications may be found in the Department of Commerce library, Room 4109, 26 Federal Plaza, New York, N. Y."

exclusive privilege of certifying candidates for appointment to the Board of Elections for the entire city, including the three other counties having an aggregate population of 12% of the total city's population. In 1960, they enjoyed the same exclusive privilege, although their aggregate populations constituted only 56% of the total city population. Today, they enjoy that same exclusive privilege, despite the fact that their aggregate populations represent only 52% (a decrease of 36% since 1900) of the total city population. The persistence of this certifying aspect of § 31 of the Election Law is somewhat redolent of the rotten boroughs in English history.

As to the residency requirements of commissioners certified by the Kings and New York County Committees of the Republican and Democratic parties, §§ 30 and 31 (as amended in 1970) do not, *in haec verba*, limit such nominees and appointees to qualified voters residing in New York and Kings Counties. They provide that those so nominated and appointed shall be residents and qualified voters of the City of New York. A politically naive reader would conclude that the New York Legislature was providing, in fact, for the nomination and the appointment of qualified voters from among all such voters throughout the City of New York; that it never occurred to the members of the Legislature that the County Committees of the two dominant political parties would be so provincial as to certify to the City Council only Republicans and Democrats resident and politically active in New York and Kings Counties, albeit the annual salary of each such commissioner, for a part-time job, is substantial and the Board of Elections is vested with authority to appoint all of its supporting personnel. It was not developed on argument or in briefs how many such personnel are employed by the Board; the total payroll; how many of such persons, if any, are residents of counties other than New York and Kings Counties. It is to be noted that § 36 of the Election Law empowers the Board of Elections to "appoint and at pleasure remove deputies, clerks, voting machine custodians and other employees * * * in the city of New York, * * * The board of elections also may fix the number and salaries of its employees * * * "

In their brief and on the argument of this appeal, plaintiffs-appellants have asserted that "in the entire history of the Board every commissioner has resided in New York and Kings County" (brief, p. 2). In an affidavit submitted to the court below in support of the motion for summary judgment, it was asserted that "there has been no commissioner of the Board of Elections since 1920 who was not a resident of Kings or New York County" (reply brief, p. 8). Neither the defendants-appellees nor the intervenor-appellee has challenged these assertions.

When the second paragraph of § 31 of the Election Law was amended by the Laws of 1949, c. 574, § 3, the Joint Legislative Committee to Revise and Recodify the Election Law explained this 1949 amendment as follows:

1949 Revision Note. In second paragraph, the words "or of the borough of the Bronx" have been deleted, and the word "Kings" has been substituted for "such city". The matter which has been deleted is inconsistent with the practical application of the provisions of the first paragraph of section 31. This provides that recommendations for appointment of commissioners of election shall be made by the respective chairmen of the county committees within the counties of New York and Kings. Obviously, the only persons whom such chairmen will recommend for such appointments are residents of their respective counties, namely, New York and Kings. Therefore, the reference in the second paragraph (relating to filling of vacancies) to a commissioner of elections being a resident of the borough of Bronx is being deleted because no such situation would ever exist. The insertion of the word "Kings" is consistent with the practical effect of the provisions contained in the first paragraph.—Memo of Joint

Legislative Committee to Revise and Recodify the Election Law.

New York Election Law § 31 (McKinney 1949).

It would appear from the brief of plaintiffs-appellants that this legislative history was not brought to the attention of Judge Frankel.

During the argument on appeal, the court was informed that a bill to amend § 31 was pending in the New York State Legislature. Senate Bill 2997–B proposed that the Board of Elections of the City of New York consist of ten commissioners, two of whom shall be appointed from each of the five counties of the city and not more than one member from each county shall belong to the same political party. Recommendations for appointment of commissioners were to be made by the chairman of the executive committee of each county committee of each county or, if no such office exists, by the chairman of each such committee, the authority to make such recommendations being limited to each of the two political parties having cast the highest and next highest number of votes for Governor at the last preceding general election. This bill was passed by both houses of the New York Legislature and submitted to the Governor for signature. Conceivably, if enacted into law, it would have cured the substantial constitutional infirmities claimed by plaintiffs-appellants.

Governor Rockefeller did not approve the bill. In his disapproving memorandum, dated June 7, 1971, he recognized the "meritorious objective of providing representation on the New York City Board of Elections to the Counties of Queens, Bronx and Richmond. Under existing provisions of law, the Board of Elections has been comprised for many years of four members, two each from New York and Kings Counties; the staff of the Board has also been disproportionately weighted in favor of those two counties. Although the intent of these bills [Senate Bills No. 2797–B and 6171]. is meritorious, they must be disapproved for the same reason I disapproved similar

proposals in 1969. (disapproval memorandum numbers 357 and 358)." Neither earlier memorandum has been made available to the court. But other statements in the instant memorandum suggest that at least one reason for the disapproval was the increased cost of a ten-man board during the current period of severe fiscal austerity.

The Board of Elections of the City of New York is no mere clerical staff nor are the tasks delegated to it merely ministerial. It plays a vital role in the elective process when it creates, consolidates, divides or otherwise alters election districts, § 64(1); designates the place in each election district "at which the meetings for the registration of voters and the elections and primaries shall be held," § 66(1); conducts examinations of and appoints those found qualified to serve as election officers, §§ 40, 41; removes for cause any election officer it has appointed "without preferring any charges and without notice to such officer," § 45; subpoenas persons to attend before the board, § 38; causes investigations to be made of persons believed not entitled to vote, § 62; prepares for each election district, in which registration is required to be personal, a challenge list of those who have lost the right to register from a given address and delivers such lists to the respective boards of inspectors, § 63; determines the order in which the names of candidates nominated by independent bodies shall appear on the voting machine and on official primary ballots, § 104; determines that a voter is not entitled to an absentee voter's ballot, §§ 117, 117–a, 118; makes a determination of objections to a petition or certificate of designation or nomination, § 145.

That the Board of Elections is not merely a ministerial body is evidenced by an article published in The New York Times, Sunday, June 27, 1971, p. L 41 U. "Defying state law, the city's Board of Elections will permit persons 18 to 21 year [sic] old to wait as long as next May 20 to register for voting in the state presidential primary next June," despite the fact that, under state law, those in

this age group would have to register before November 3, 1971 in order to qualify as voters in the presidential primary to be held in June 1972.

The court is reluctantly constrained to and does hereby reverse the order of Judge Frankel and remand for consideration on the merits.