Anthony F. LoFRISCO, on behalf of himself and all others similarly situated, Plaintiff,

v.

Gloria SCHAFFER, as Secretary of the State of the State of Connecticut and Edith R. Gregory, as Town Clerk of the Town of Wilton, State of Connecticut, Defendants.

Civ. No. B–383.

United States District Court,
D. Connecticut.

April 25, 1972.

Anthony F. LoFrisco, New York City, pro se.

Robert K. Killian, Atty. Gen. of the State of Conn., Raymond J. Cannon and Daniel R. Schaefer, Asst. Attys. Gen., Hartford, Conn. for defendant Gloria Schaffer.

William R. Curtis and Robert A. Fuller, Wilton, Conn., for defendant Edith R. Gregory.

Before SMITH, Circuit Judge, and BLUMENFELD and CLARIE, District Judges.

## MEMORANDUM OF DECISION

J. JOSEPH SMITH, Circuit Judge:

Anthony LoFrisco challenges the Connecticut Minority Representation statute, C.G.S.A. § 9–167a,[1] and the specific

---

1. C.G.S.A. § 9–167a. Minority representation

(a) The maximum number of members of any board, commission, committee or similar body of the state or any political subdivision thereof, whether elective or appointive, except any such board, commission, committee or body, whose members are elected on the basis of a geographical division of the state or such political subdivision, who may be members of the same political party shall be as specified in the following table:

| COLUMN I<br>Total Membership | COLUMN II<br>Maximum from one Party |
|---|---|
| 3 | 2 |
| 4 | 3 |
| 5 | 4 |
| 6 | 4 |
| 7 | 5 |
| 8 | 5 |
| 9 | 6 |
| More than 9 | Two-thirds of total membership. |

(b) Prior to any election for or appointment to any such body, the town clerk, in cases of elections, and the ap-

statutes directed at elections for Boards of Education in the localities in the state. C.G.S.A. §§ 9–204,[2] and 9–414.[3] He claims that the limitation on the number of candidates his party can nominate for the vacancies on the board and the limit on the number for whom he can vote deny him the vote in violation of the Fourteenth Amendment and dilute his vote by permitting relatively few voters to elect a candidate to a vacancy on the board. Plaintiff resides in, pays taxes to and owns property in the Town of Wilton, Connecticut. Plaintiff voted in the November 2, 1971 election for the Board of Education. The following represents the party affiliations of regis-

pointing authority, in cases of appointments, shall determine the maximum number of members of any political party who may be elected or appointed to such body at such election or appointment. Such maximum number shall be determined for each political party in the following manner: From the number of members of one political party who are members of such body at the time of the election or appointment, subtract the number of members of such political party whose terms expire prior to the commencement of the terms for which such election or appointment is being held or made and subtract the balance thus arrived at from the appropriate number specified in column II of subsection (a) of this section.

(c) In the case of any election to any such body the winner or winners shall be determined as under existing law with the following exception: The town clerk shall prepare a list of the candidates ranked from top to bottom according to the number of votes each receives; when the number of members of any one political party who would be elected without regard to this section exceeds the maximum number as determined under subsection (b) of this section, only the candidates of such political party with the highest number of votes up to the limit of such maximum shall be elected, and the names of the remaining candidates of such political party shall be stricken from the list. The next highest ranking candidates shall be elected up to the number of places to be filled at such election.

(d) If an unexpired portion of a term is to be filled at the same time as a full term, the unexpired term shall be deemed to be filled before the full term for purposes of applying this section. At such time as the minority representation provisions of this section become applicable to any board, commission, committee or body, vacancies thereafter occurring shall be filled by election or appointment of a member of the same political party as that of the vacating member.

(e) Nothing in this section shall be construed to repeal or modify any general or special act which provides for a greater degree of minority representation than is provided by this section.

(f) Nothing in this section shall deprive any person who is a member of any such body on July 1, 1960, of the right to remain as a member until the expiration of his term.

(g) For the purposes of this section, a person shall be deemed to be a member of the political party on whose enrolment list his name appears on the date of his appointment to, or of his nomination as a candidate for election to, any office specified in subsection (a) of this section, provided any person who has applied for erasure or transfer of his name from an enrolment list shall be considered a member of the party from whose list he has so applied for erasure or transfer for a period of six months from the date of the filing of such application and provided further any person whose candidacy for election to an office is solely as the candidate of a party other than the party with which he is enrolled shall be deemed to be a member of the party of which he is such candidate.

2. C.G.S.A. § 9–204. Minority representation on board of education

When the number of members to be elected to the board of education for the same term at any election is even, no elector shall vote for more than half that number. When the number of members to be elected to the board of education for the same term at any election is odd, no elector shall vote for more than a bare majority of that number.

3. C.G.S.A. § 9–414. Nominations not to exceed places to be filled; municipal primaries

No town committee, caucus or convention shall endorse and certify to the clerk of a municipality, and no primary shall choose, more candidates for nomination to municipal office or more persons as members of a town committee or as delegates to a convention than an elector may vote for in each such case.

tered voters of the Town of Wilton for the years indicated.

**1967**

| | | |
|---|---|---|
| Republicans | 3196 | 62% |
| Democrats | 804 | 16% |
| Unaffiliated | 1138 | 22% |
| TOTAL | 5138 | 100% |

**1969**

| | | |
|---|---|---|
| Republicans | 3702 | 61% |
| Democrats | 934 | 15% |
| Unaffiliated | 1434 | 24% |
| TOTAL | 6070 | 100% |

**1971**

| | | |
|---|---|---|
| Republicans | 3860 | 58% |
| Democrats | 1263 | 19% |
| Unaffiliated | 1536 | 23% |
| TOTAL | 6659 | 100% |

The following represents the votes cast in the three most recent elections for the Wilton Board of Education.

**NOVEMBER 1967**

| | |
|---|---|
| a) DeVries (Rep.) * | 2352 |
| b) McGlathey (Rep.) * | 2262 |
| c) Kanauth (Dem.) | 1273 |
| d) Woodside (Dem.) * | 1321 |

**NOVEMBER 1969**

| | |
|---|---|
| a) Colville (Rep.) * | 2595 |
| b) Copley (Rep.) * | 2428 |
| c) Adams (Rep.) * # | 2767 |
| d) Learman (Dem.) | 985 |
| e) Mac Coll (Dem.) * | 1317 |

**NOVEMBER 1971**

| | |
|---|---|
| a) Donovan (Rep.) * | 2466 |
| b) Wolff (Rep.) * | 2436 |
| c) Channell (Dem.) | 1979 |
| d) Maher (Dem.) * | 2047 |
| e) Lawson (Ind.) | 293 |

* Elected

#Ran unopposed to fill vacancy

A portion of plaintiff's real and personal property taxes are used exclusively by the Wilton Board of Education for the Wilton public school system. The defendants, the Secretary of the State and the Town Clerk of the Town of Wilton, move to dismiss the action on the grounds that the federal court ought to abstain and give the state courts an opportunity to construe these statutes, dealing as they do with areas of vital importance for the state. We hold that abstention is not called for, and on the merits hold the statutes not in violation of the Constitution of the United States and order judgment for defendants, dismissing the action.

The case presents new and somewhat complicated questions.

The school board statute, which antedates the general minority representation statute, provides that every elector can only vote for half of the vacancies on the board at any election, if an even number of members are being selected, and for a bare majority when the number is odd. Section 9–414 provides that each town committee or caucus can only nominate as many people as any one elector can vote for at the polls. Section 9–167a, the general statute, applies to "any board, commission, committee or similar body of the state or any political subdivision thereof, whether elective or appointive, except any such . . . body whose members are elected on the basis of a geographical division of the state or such political subdivision. . . ." It sets the maximum number of individuals of the same political party who may sit on any such board; the majority may, in all instances, have two-thirds or more of the members of the board (i. e., it may take 2 of 3, 3 of 4, 4 of 5, 5 of 7, 5 of 8, and two-thirds of 9 or more). The statute does not limit the number who can run, but directs the town clerk to follow numerical results until the majority reaches its limit and then to disregard the other majority party candidates even though they may in absolute terms have more votes than the minority candidates who will be elected. The statute provides that "nothing in this section shall be construed to repeal or modify any general or special act which provides for a greater degree of minority representation than is provided by this section."

A set of statutory provisions governs the numbers and terms of board of education members; section 9–203 provides that boards are to be comprised of 3,

6, 9 or 12 members; section 9–205 provides that 5 or 7 member boards are an acceptable alternative. If the board follows section 9–203, one-third of the members are elected every year for three years; if the town has biennial elections, one-third are elected every time, for six-year terms. If a board has 5 or 7 members, three are to be elected in the odd years and 2 or 4, respectively, in the even years. All have two-year terms. If there are biennial elections, 2 (for the 5-person board) and 3 (for the 7-person board) are elected at one time and the remaining members at the alternate election. All have four-year terms.

Thus, in the normal election in plaintiff's town, two members will be elected. In the election of 1971, about which the complaint is drawn, three seats were open. Only two would be allowed to be Republican nominees; the electors could vote for only two. The statute does not mention vacancies; an Opinion of the Attorney General of July 8, 1965, advised that they must be filled in accord with minority representation.

■ The Fourteenth Amendment one-man-one-vote principle clearly applies here. The Supreme Court, in Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) held that any local body, whether it had administrative or legislative tasks, which was elected by the people had to comply with the one-man-one-vote principle of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and its progeny. In the *Hadley* case, the districts which elected the trustees were of quite different population, so the substance of the claim itself was the typical malapportionment dilution problem. This holding somewhat superseded Sailors v. Board of Education, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967), which had held an appointive board with administrative duties not subject to the one-man-one-vote rule. The fact that an office is elective is in itself proof that it is important and must be in compliance with Reynolds v. Sims, 377 U.S.

533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

The defendants, as noted above, urge that the court abstain and dismiss the action, so that a determination of the congruence of the two statutes can be made by the state court. The issue that would be presented would be the effect of the proviso in section 9–167a about other statutes providing greater minority representation on the school board election statute. At least on its face, section 9–204 does provide for more minority representation than section 9–167a, as the former allows the majority only half or a bare majority of the nominations, while the latter permits it to take two-thirds of the membership. Therefore, normally, section 9–167a would not come into play. However, situations would arise, over time (and dependent on the staggering of terms, etc.) in which section 9–167a could be violated while section 9–204 was fully complied with. In such a situation, under one view, section 9–167a would come into effect and supplement section 9–204. In this view, section 9–167a would operate in any specific situation in which its provisions would be violated. In another view, since section 9–204 does, on its face and in the normal situation, demand more minority representation than section 9–167a, the latter would be considered irrelevant and would never be applied. The first interpretation is the one apparently now being followed, and it would seem to make sense, as the legislature apparently wanted to provide, with section 9–167a, for a bare minimum of minority representation in all elections.

The state court might decide otherwise, however, and thereby remove section 9–167a from consideration. It would not, however, obviate the need to examine the equal protection argument against section 9–204. The only precedent for abstention on an issue deriving from the minority representation statute, Montano v. Lee, 384 F.2d 172 (2d Cir. 1967) is not encouraging. In re-

viewing a challenge to New Haven aldermanic elections, the court of appeals held that the district court had been premature in deciding whether section 9–167a applied to general legislative bodies of towns and cities. The court abstained, retaining jurisdiction, but the Connecticut Supreme Court, in Hoblitzelle v. Frechette, 156 Conn. 253, 240 A.2d 864 (1968), refused to give any hint of an interpretation. This was ostensibly because the federal court had retained jurisdiction and therefore the state decision would be merely an advisory opinion. That the same parties were not before the two courts and that the federal court had, by supervising the election, made it no longer a state function but a federal one, were also factors.

■ The defendants here claim that if the court dismisses the action rather than abstaining, and if the same plaintiff brings a case in the state court, the two statutes will be construed. In the present suit, the need for speedy action exists to the same extent as it does in relation to all voting questions for next fall; and in light of the outcome in *Montano*, dismissal in hope that this will induce the state court to speak seems inappropriate. *See* Weiss v. Duberstein, 445 F.2d 1297 (2d Cir. 1971).

■ This case does not present the now familiar claim of malapportionment —that an individual's vote is debased because by virtue of his geographic location, it is worth less than the vote of an individual in another district or location. Given the fact of the restriction on number of nominees and number of votes an elector has, LoFrisco's individual vote does get as much weight as that of any other individual. One could not say before the election that the votes of a discernable minority or group would be worth less than those of other voters. He raises somewhat different, "effective representation" arguments. First, he claims that he is denied the vote because he can only vote for two instead of three vacancies. This is hard to

transform into a strong equal protection claim, as all voters are treated equally. The argument really seems to come down to substantive due process—that it is completely arbitrary and capricious for the law to provide that no one can vote for more than a bare majority of the candidates. Limited voting schemes of various sorts have been held permissible, however, in other states and localities. *See* Blaikie v. Power, 13 N.Y.2d 134, 243 N.Y.S.2d 185, 193 N.E.2d 55 (1963), *appeal dismissed for want of a substantial federal question*, 375 U.S. 439, 84 S.Ct. 507, 11 L.Ed.2d 471 (1964); People ex rel. Daniels v. Carpentier, 30 Ill. 2d 590, 198 N.E.2d 514 (1964). The device is therefore apparently not per se impermissible, and is not arbitrary if the state's interest in minority representation is legitimate and if this is a reasonable way of attaining that end. And, given the diversity and experimentation that one would like to see in local government, such a policy is indeed rational and the means chosen here permissible from the due process standpoint.

The other branch of LoFrisco's argument is really the heart of the case. This is an objection to the fact that a relatively small number of minority-affiliated voters can elect a board member. LoFrisco essentially argues that the majority's vote is diluted because it is not allowed to elect as many members as it could were it free to take an unlimited number of seats on the board. Therefore in a Republican town the Republican votes, all of which go to the artificially limited number of candidates, are worth less in electing their two representatives than the many fewer minority votes are worth in electing their one. Defendants contend that the majority is if anything over-represented in percentage of seats, which may be true over all, but it does seem that the majority party is denied the full force of its strength; this is in fact the very goal of the statute. The questions are whether this dilution is cognizable as

an individual right and whether it is justified by legitimate state policies.

In some respects, section 9–204 bears a resemblance to the rules in cases such as MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3 (1948), involving the requirement that third parties meet certain standards to get on the ballot, or rules regulating the right of an individual to run on the party ticket soon after he deserted it in an election. *But see* Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). The courts have held that states and parties can have rules governing access to the ballot and that such rules, if reasonable, are not examined in an attack on the ultimate vote as unrepresentative.

In another analogy, one can also see section 9–167a, and to a lesser extent section 9–204, as similar to the supermajority rules, i. e., that a proposition must receive 66% of the vote to be passed or approved. In that situation, the votes of the people saying "yes" are diluted as compared to those voting "no" in the same way that those choosing a majority candidate are diluted as compared to a minority one. In a recent case, Gordon v. Lance, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971) the Supreme Court held that the method was permissible, at least for decisional elections such as bond issues. The Court stated that the defect in earlier cases, such as Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), and Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), was in the denial or dilution of voting power because of group characteristics—geographical location and property ownership—that bore no valid relation to the interest of those groups in the subject matter of the election; moreover, the denial or dilution was imposed irrespective of how members of those groups actually voted. The Court held that as long as the supermajority requirement did not discriminate against any identifiable class, it did not violate the equal protection clause. The Court specifically noted that it was not deciding whether such a restriction or dilution would be permissible in elections of officials, in which individuals may be entitled to more equality than they are in an election which is in essence a substitute for the vote of the legislature, which can legitimately decide that given issues are so important that they require more than majority assent. Though not directly on point, the opinion does seem clearly to say that the dilution is not cognizable under the Fourteenth Amendment unless it discriminates between groups on the basis of some *a priori* characteristic unrelated to how they vote and to the subject matter of the election. This indicates that the fact that section 9–167a makes explicit the minority representation mechanism at work would not distinguish it from section 9–204 and would not invalidate either.

█ If we assume there is some dilution (though, as noted above, the particular nature of this statute and the fact that the voting cases take the standpoint of the individual voter and not a party or group perspective make it difficult for LoFrisco to show any discrimination against his vote) we must focus on the state's policies and goals in enacting this legislation. As the court said in Montano v. Lee, *supra,* 384 F.2d at 175: "There is room for the states in structuring their subordinate agencies, including the cities, to experiment with new methods and devices to insure that all points of view may be sure of a hearing, so long as there is no invidious discrimination against any individual or group's right to cast votes on an equal basis with all others. The constitutional limitations on such methods and devices have been little explored, and an essential starting point in such an exploration must be a determination of the legislative intent in adopting the plan, method, or device."

Minority representation is apparently a rare breed of election procedure; few other states have such statutes, although

some cities do use it. The idea is a cross between pure majority rule, allowing the majority to sweep all seats if it receives 51% of the votes, and a pure proportional representation scheme, which gives the minorities representation in proportion to the amount of vote they draw. The minority representation statute is essentially a fixed ratio proportional representation statute, giving the minority one-third (in most instances) whether it has 33% of the support or 1% of it. Thus, the statute has other policy considerations than reflection of the voters' choices behind it. The legislature felt that it was important, on boards with traditionally nonpartisan duties (if there are such in Connecticut) as well as those with clearly "political" duties, to have a significant minority voice, to air and introduce ideas which the majority might not otherwise consider. The statute was not meant to wrest power and control from the majority, but to assure intelligent decision-making. Snyder & Pearson, authors of an article in 39 Conn. B.J. 1 (1965) "Effect of Malapportionment Cases on Political Subdivisions of the State," feel that it is hard to fault minority representation as non-democratic or impermissible as a legislative goal. It avoids instability by having members of two parties always present, and it is not anti-majoritarian to limit the power of the majority to command more power than its actual strength at the polls. The authors feel that a minority representation scheme compares to a pure majoritarian rule as single-member districting does to an at-large election; the minority scheme and the districting allow (or assure) small groups with distinct ideas some representation.

The only state judge passing on the Connecticut minority representation statute also felt it was permissible, although the opinion came at a time when *Hadley* had not been decided, and the decision rested largely on the fact that the body in question was administrative, as is not clear in the case before us.

(A distinction was also drawn in a later-inserted footnote on the basis of the type of objection to the plan, as *Hadley* was decided before it was printed. Blanco v. Gangloff, 28 Conn.Sup. 403, 265 A.2d 502 (1970)). In that case, however, the court noted that the evil aimed at in the reapportionment cases, that is, the control of the legislative body by a minority of the voters, was not brought about by the minority representation law and that the restriction on the majority in some instances was no worse than the loss by the minority, under different rules, of any voice at all.

A flexible ratio scheme, or true proportional representation, might be a wiser plan, but the legislature has decided to trade for that mathematical accuracy an insistence on individuals with different party affiliations and therefore, different ideas. The assumption that the only way in which to obtain diverse views is to classify by political party and the view that the party groups are somewhat monolithic, may not be necessarily correct, but this is permissible and even approximately true perception. Given, therefore, the greater latitude shown at the local level for dilution of votes caused by a legitimate state policy, the scheme is not unconstitutional or insufficient as an explanation of some dilution. *See* Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971).

Whether and how LoFrisco's vote is diluted is not exactly clear, however. He really is claiming that he is denied his representation not as an individual but as a party member. He is like the plaintiffs in Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), who claimed that they were an identifiable group, on grounds other than, but including party, which was given less than its strength in representation. Their argument was that multi-member districts were the means by which they were deprived of their representative (the obverse of this case, in

which the statute assures the minority one "district.") The Court in *Whitcomb* found that the plaintiffs had not shown discrimination against their particular group in terms of lack of access to the process and that their real complaint was the fact that their party did not win rather than any problem with the system itself. And the Court suggested that although it might be possible (this is hard to see, given the nature of the proof the Court rejected there) to show that a discernable group, socio-economically distinct, was discriminated against by such a scheme, the complaint would not state a claim if it came down to party disadvantage. Such questions, (as has been held by several lower courts) are political and non-justiciable.

This appears to be the basic flaw in LoFrisco's argument; whether the case is seen as a dilution of his vote as a Republican or a discrimination against the party as such, it requires recognition by the court of political affiliation as a standard for classification which is protected, as are groupings based on race, religion, etc. And the courts have refused so far to take cognizance of the claims of such groups; the same reasoning which makes party affiliation irrelevant in legislative districting requires the court to refuse to enter into issues of party discrimination, if all are treated equally. This may seem ironic and troublesome since the statute in question does take party affiliation explicitly into account, but the above cases are still applicable, although less directly on point. Since the issue is a political one and complaints solely about groupings or distinctions on these bases are not justiciable, the dilution of the vote of the individual in the majority party is not a violation of the Fourteenth Amendment. Neither of the statutory minority representation schemes in issue is forbidden by the Constitution of the United States.

The foregoing may constitute the court's findings and conclusions under Rule 52(a) Fed.R.Civ.P.

Judgment may enter for the defendants, dismissing the complaint.