John W. HECHINGER et al.,
Plaintiffs,

v.

Robert MARTIN, Chairman, District of
Columbia Board of Elections and
Ethics, et al., Defendants.

Civ. A. No. 74–1666.

United States District Court,
District of Columbia.

March 24, 1976.

Joseph H. Sharlitt, Washington, D. C.,
for plaintiffs.

Wilfred R. Mundle, Washington, D. C.,
for defendants.

Samuel C. Jackson, Washington, D. C.,
for intervenor Moore.

Austin P. Frum, Washington, D. C., for intervenor D. C. Republican Committee.

John D. Hawke, Jr. and Thomas B. Wilner, Washington, D. C., for intervenor Rich.

Before WRIGHT, Circuit Judge, and BRYANT and PRATT, District Judges.

## MEMORANDUM AND ORDER

This case is now before the Court on Plaintiffs' Motion For Summary Judgment And For Entry of Permanent Injunction, Defendants' Cross-Motion For Summary Judgment, and the Joint Cross-Motion of Intervenors For Summary Judgment. For the reasons explained herein, plaintiffs' motion is denied, and summary judgment is granted for defendants.

### Background

The facts of this case are not in dispute. Plaintiffs Hechinger, Huff, Lewis, Dulcan, and Berenson are affiliated Democrats in the District of Columbia. Plaintiff Democratic Central Committee is the District of Columbia's local Democratic party organization. Intervenor Republican Committee is the District of Columbia's local Republican organization. Intervenor Jerry A. Moore, Jr. is an affiliated Republican who was elected on November 5, 1975 to one of four at-large seats on the District of Columbia Council. Intervenor Rich is an unaffiliated voter who was defeated in his bid for one of the four at-large seats on the Council in the election of November 5, 1975. Defendants Martin and Chapman are chairperson and member respectively on the District of Columbia Board of Elections and Ethics.

Plaintiffs in this case seek a judgment declaring Sections 401(b)(2)[1] and 401(d)(3)[2] of the District of Columbia Self-Government and Governmental Reorganization Act[3] unconstitutional and enjoining the defendant Board from enforcing those limitations. In an earlier action,[4] in which plaintiffs sought similar relief immediately prior to the 1974 election, the Court held that the action should be dismissed, without prejudice to refiling, because it was then too close to that election for the Court to take responsible action. The present action is substantially the same as the earlier action, as permitted by that decision.

The District of Columbia Self-Government and Governmental Reorganization Act provides for the election of a Council for the District of Columbia to act as the District's legislature. The Council is made up of thirteen members. Eight are elected from wards, four are elected at-large, and one is elected at-large separately as chairperson of the Council. The purpose of the limitations contained in the sections at issue is to ensure minority representation on the Council (as of March, 1975, 76.55% of the District's qualified voters had affiliated with the Democratic party). The act was signed by the President on December 24, 1973. On May 7, 1974, pursuant to its provisions, the Act was submitted to the voters of the District and was approved by a majority of 82.74% of the vote cast. As a result of the November 5, 1974 election, Democrats were elected to all eight ward seats on the Council, to two of the at-large seats, and to the chair of

---

1. Section 401(b)(2) reads:

   In the case of the first election held for office of member of the Council after the effective date of this title, not more than two of the at-large members (excluding the Chairman) shall be nominated by the same political party. Thereafter, a political party may nominate a number of candidates for the office of at-large member of the Council equal to one less than the total number of at-large members (excluding the Chairman) to be elected in such election.

2. Section 401(d)(3) reads:

   Notwithstanding any other provision of this section, at no time shall there be more than three members (including the Chairman) serving at large on the Council who are affiliated with the same political party.

3. P.L. 93–198, 93rd Cong., 87 Stat. 744 (1973).

4. *Dulcan v. Martin*, D.C., 64 F.R.D. 327, Decided October 18, 1974.

the Council, for a total of 84.6% of the votes on the Council. Plaintiffs now seek to have the Court invalidate Sections 401(b)(2) and 401(d)(3) of the Act on First and Fifth Amendment grounds.

### First Amendment

■ Plaintiffs claim that the statute deprives them of First Amendment rights in two respects. In the first place, it prevents plaintiffs as registered Democrats from exercising their vote in accordance with their political beliefs in the election of at-large councilmen on the District of Columbia City Council. Additionally, according to plaintiffs, the statute prevents them from free and effective association with other Democrats in political activity aimed at electing Democrats to the at-large seats on the Council. Intervenors' version of the question presented by plaintiffs' claims is well stated, i. e. that plaintiffs' claims in this regard present the question whether the Constitution requires that the political party with the majority of registered voters must have the right in an election for a multi-member body to elect all the members of that body.

We have examined all the authorities cited by plaintiffs in support of their position, and are unable to discern any such requirement. On the contrary, it appears that the minority representation provision is more compatible with the First Amendment than plaintiffs' requirement would be.

No one seriously contests the fundamental nature of the rights claimed by plaintiffs under the First Amendment, and the Supreme Court has in fact articulated the concept on many occasions— most recently in *Buckley, et al. v. Valeo, Secretary of the United States Senate, et al.,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed. 2d 659, 44 LW 4127 (1976).

But this latest expression from the Supreme Court appears to meet in a somewhat head-on fashion all of plaintiffs' claims in this regard.

"The Court's decisions involving associational freedoms establish that the right of association is a 'basic constitutional freedom' that is 'closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.' *Kusper v. Pontikes,* 414 U.S. [51] at 57, 94 S.Ct. [303] at 307 [38 L.Ed.2d 260]; *Shelton v. Tucker,* 364 U.S. 479, 486, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960). See, e. g. *Bates v. Little Rock,* 361 U.S. 516, 522–523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama,* 357 U.S. [449] at 460–461, 78 S.Ct. [1163] at 1170–1171, [2 L.Ed.2d 1488]; *NAACP v. Button,* 371 U.S. [415] at 452, 83 S.Ct. [328] at 347 [9 L.Ed.2d 405] (Harlan, J., dissenting). In view of the fundamental nature of the right to associate, governmental 'action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.' *NAACP v. Alabama,* supra, 357 U.S. at 460–461, 78 S.Ct. [1163] at 1171 [2 L.Ed.2d 1488]. Yet, it is clear that '[n]either the right to associate nor the right to participate in political activities is absolute.' *Civil Service Comm'n v. National Association of Letter Carriers,* 413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973). Even a ' "significant interference" with protected rights of political association' may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms. *Cousins v. Wigoda,* 419 U.S. [477] at 488, 95 S.Ct. 541, 42 L.Ed.2d 595; *NAACP v. Button,* supra, [371 U.S.] at 438, 83 S.Ct. [328] at 340 [9 L.Ed.2d 405]; *Shelton v. Tucker,* supra, [364 U.S.] at 488, 81 S.Ct. [247] at 252 [5 L.Ed.2d 231]."

—— U.S. ——, 96 S.Ct. at 637, 46 L.Ed.2d at 690–691, 44 U.S.L.W. at 4134.

We think that the Congress' interest in facilitating some representation of political minorities on the City Council of the nation's capitol is a valid one, sufficiently important to warrant the challenged interference with the rights of political association, and that the means adopted to promote that interest are reasonable and do not amount to an unnecessary abridgment of those rights.

But for the restriction of the challenged sections the majority party (Democratic at present) would be able to elect all of its candidates to the council, thus leaving a minority without any input into council activity. The concept of minority representation, or stated in another fashion, limitations on majority representation, is entirely consistent with First Amendment principles of freedom of expression and association, and appears altogether legitimate as a legislative objective. Various schemes for accomplishing the purpose of such legislation, including measures identical, or nearly so, to the sections here challenged have been examined in the light of constitutional standards and declared to be valid.

In *Kaelin v. Warden*, 334 F.Supp. 602 (E.D.Pa.1971) Pennsylvania adopted a scheme known as limited voting in an effort to encourage what the Court described as ". . . a fairer or more effective representation than would otherwise result if a simple plurality rule were used in which the majority elects all the commissioners, for this would necessarily discriminate by entirely discounting the votes of the minority electors". In an election for a board of three commissioners each elector could vote for no more than two persons. The three having the highest number of votes were elected. The Court characterized the purpose as a "legitimate political goal", and the limited voting scheme an "acceptable method" to accomplish it.

Illinois' minority representation effort limits each party's nominations for 177 seats in the State House of Representatives to 118. A constitutional attack on the statute was rejected by the state's highest court, which observed that ". . . minority representation in the House is a principle firmly entrenched in the democratic traditions and ideologies of this State". *People v. Carpentier*, 30 Ill.2d 590, 198 N.E.2d 517 (1964).

Assurance of some minority representation on the city council was the objective of a provision of the New York City charter which combined the features of limited voting by the individual elector along with a limitation on the number of candidates of any particular political party. The council was to consist of a single member elected from each ward in the city in addition to ten at-large members—two elected from each of five boroughs. Political parties were restricted to nominating only one candidate for the at-large seats in each borough, and each elector could vote for only one boroughwide candidate. A provision for some minority representation in a multiple body was recognized as a laudatory legislative endeavor by Judge Fuld in an opinion rejecting an attack on the charter provision on constitutional grounds. *Blaikie v. Power*, 13 N.Y.2d 134, 243 N.Y.S.2d 185, 193 N.E.2d 55 (1963), *Appeal dismissed for want of a substantial federal question*, 375 U.S. 439, 84 S.Ct. 507, 11 L.Ed.2d 471 (1964). He stated that "such representation can play an important role in a democracy", and cited the language of an earlier decision of his court which characterized the concept (minority representation) as "an attempt to make representative government a reality" (*Johnson v. City of New York*, 274 N.Y. 411, 430, 9 N.E.2d 30, 38).

A Connecticut minority representation statute similar to the one in *Blaikie, supra*, limits the number of candidates a political party can nominate for vacancies on multi-member boards, commissions, etc., and also the number for whom an elector can vote. In *Lo Frisco v. Schaffer*, 341 F.Supp. 743 (D.Conn. 1972) a unanimous three-judge district court, in turning away a constitutional attack on the restrictions, agreed with the legislature that it was "important, on boards . . . to have a significant minority voice, to air and introduce ideas which the majority might not otherwise consider", and observed that "the statute was not meant to wrest power and control from the majority, but to assure intelligent decision-making". (*Id.* at 750)

In *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) the

Supreme Court recognized a so-called "political fairness principle" in the allocation of party strength when it approved a districting scheme in Connecticut designed "to produce a different—a more 'politically fair'—result than would be reached with elections at large, in which the winning party would take 100% of the legislative seats . . ." Implementation of this policy of political fairness was recognized as a sufficient basis for allowing some deviation from absolute population equality among voting districts contemplated by the one man-one vote concept. Obviously this same policy of political fairness prompted the Congress to impose the restrictions here challenged. Indeed, the chairman of the House District Committee articulated such a rationale when he stated that the scheme constituted a fair and equitable protection of minority interests.

Plaintiffs' suggestion that the Supreme Court overlooked, or otherwise somehow missed, the glaring constitutional infirmities present in both *Blaikie* and *Lo Frisco* is unpersuasive. We believe it more likely that those infirmities, so apparent to plaintiffs, were not discernible to the Court not because of any oversight, but because they in fact do not exist, and that the Court left *Blaikie* and *Lo Frisco* intact for the same reasons which prompted it to conclude in *Gaffney v. Cummings, supra* 412 U.S. at 754, 93 S.Ct. at 2332, 37 L.Ed.2d at 312:

> What is done in so arranging for elections, or to achieve political ends or allocate political power, is not wholly exempt from judicial scrutiny under the Fourteenth Amendment. As we have indicated, for example, multimember districts may be vulnerable, if racial or political groups have been fenced out of the political process and their voting strength invidiously minimized. See *White v. Regester*, [412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314] supra; *Whitcomb v. Chavis*, [403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363], supra. See also *Gomillion v. Lightfoot*, [364 U.S. 339, 81 S.Ct. 125,

5 L.Ed.2d 110] supra. Beyond this, we have not ventured far or attempted the impossible task of extirpating politics from what are the essentially political processes of the sovereign States. Even more plainly, judicial interest should be at its lowest ebb when a State purports fairly to allocate political power to the parties in accordance with their voting strength and, within quite tolerable limits, succeeds in doing so. There is no doubt that there may be other reapportionment plans for Connecticut that would have different political consequences and that would also be constitutional. Perhaps any of appellees' plans would have fallen into this category, as would the court's, had it propounded one. But neither we nor the district courts have a constitutional warrant to invalidate a state plan, otherwise within tolerable population limits, because it undertakes, not to minimize or eliminate the political strength of any group or party, but to recognize it and, through districting, provide a rough sort of proportional representation in the legislative halls of the State.

It is true, as plaintiffs point out, that *Gaffney* is an apportionment case; we think however that the broad policy considerations articulated in the quoted language apply with equal force to the instant case. The election law here at issue does not fence any group out; its purpose and effect is to ensure that political minorities are represented on the Council and that dissident voices are heard in the legislative process. In the view of the Court, the purpose of the legislation is entirely harmonious with that of the First Amendment, and the means chosen to further that purpose are well within constitutional limits.

### Fifth Amendment

■ The gist of plaintiffs' Fifth Amendment claims is that the law unconstitutionally discriminates against all political parties by allowing independent candidates to be elected to all four at-

large seats while restricting candidates of any party to holding two of the four seats. Plaintiffs cite *Blaikie v. Power, supra,* as a basis for their contentions, arguing that the New York statute involved applied to both parties and independent bodies, and therefore did not discriminate in favor of independents as the District of Columbia statute allegedly does.

Plaintiffs fundamentally misunderstand the concepts involved. The New York law prohibited any group, whether it met the qualifications for a political party or not, from holding more than one seat per borough. Likewise, the D.C. law prohibits any group from holding more than two at-large seats on the Council. Plaintiffs somehow equate the phrase "independent candidate" in the D.C. context with the phrase "independent organization" in the New York context. The two are distinct, because under the D.C. law a New York "independent organization" would be covered as a political party. 1 D.C.Code § 1121(j). The plaintiffs further fail to recognize that an independent candidate is exempted from the law's restrictions precisely because that person is *not* supported by an organization which is also supporting other candidates. The entire purpose of the restriction is to prevent one organization's candidates from capturing more than two at-large seats on the Council; that danger does not exist, by definition, with independent candidates, since they are not related organizationally to any other candidates running. "Independent candidates" is not a party or organizational label, it is a label of, for want of a more appropriate word, independence. No discrimination or Fifth Amendment problem is apparent to the Court in this scheme.

Accordingly, it is by the Court this 24th day of March, 1976,

ORDERED, that plaintiffs' motion be, and hereby is, denied; and

FURTHER ORDERED, that the cross-motions of intervenors and defendants be, and hereby are, granted.