In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3300

COMMON CAUSE INDIANA,

*Plaintiff-Appellee,*

*v.*

INDIVIDUAL MEMBERS OF THE INDIANA
ELECTION COMMISSION, *et al.,*

*Defendants-Appellants.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:12-CV-1603 — **Richard L. Young**, *Chief Judge.*

ARGUED MARCH 31, 2015 — DECIDED SEPTEMBER 9, 2015

Before KANNE and ROVNER, *Circuit Judges,* and
SPRINGMANN, *District Judge.*[*]

THERESA L. SPRINGMANN, *District Judge.* Common Cause is
a national organization that advocates for, among other things,
the fairness of elections and the elimination of barriers to
voting. Its Indiana affiliate, Common Cause Indiana ("Com-

---

[*] Of the Northern District of Indiana, sitting by designation.

mon Cause"), initiated this litigation to challenge the constitutionality of the Indiana Statute that establishes the process for electing judges to the Marion Superior Court in Marion County, Indiana.[1] Common Cause contends that the election procedure established by the Statute violates the First and Fourteenth Amendments to the United States Constitution, while the State of Indiana ("the State") argues that the Statute falls within its constitutional power to regulate elections. For the reasons discussed below, we affirm the decision of the district court and find the challenged statute unconstitutional.

## I. BACKGROUND

Indiana Code § 33-33-49-13 ("the Statute" or "the Partisan Balance Statute") establishes the system for the election of judges to the Marion Superior Court in Marion County, Indiana. This system is unique in Indiana, as it is the only office where primary election voters do not vote for as many candidates as there are persons to be elected to that office in the general election. See Ind. Code § 3-10-1-6 ("At a primary election a voter may vote for as many candidates as there are persons to be elected to that office at the general election, except as provided in IC 33-33-49-13 for candidates for judge

---

[1]   Marion County is the most populated county in Indiana and is the location of Indianapolis, the state capital. *U.S. Census Bureau Delivers Indiana's 2010 Census Population Totals, Including First Look at Race and Hispanic Origin Data for Legislative Redistricting*, U.S. Census Bureau, (Feb. 10, 2011), http://www.census.gov/2010census/news/releases/operations/cb 11-cn26.html.

of the Marion superior court.").[2] Indeed, this process appears to be unique within the United States, as neither the parties nor the court have been able to find an election system quite like it.

Pursant to the Statute,[3] the thirty-six judges who comprise the Marion Superior Court are elected to six-year terms that begin on January 1 after the year of the judge's election through December 31 in the sixth year. Sixteen of the thirty-six judges were selected for terms beginning in 2006 (then 2012, and so forth). The other twenty judges were selected for terms beginning in 2008 (then 2014, and so forth).

---

[2] Indiana has a total of 92 counties. Nonpartisan judicial elections, in which no party designation appears beside the candidate's name, are used for judicial elections in Vanderburgh County (Evansville) and Allen County (Fort Wayne). St. Joseph County and Lake County implement a merit-selection system as opposed to judicial elections. The other 87 counties implement partisan judicial elections without any restrictions or provisions regarding the need for partisan balance.

[3] In its current version, as amended in 2006. The earliest version of the Partisan Balance Statute, dating back to 1975, was passed in the wake of electoral swings after the Watergate scandal. Pub. L. 308-1975, § 1, 2 Laws of the State of Indiana 1715 (1975). At that time, the Marion Superior Court consisted of seven judges elected in a partisan judicial election. Republican candidates swept all seven seats in the 1970 election, and Democratic candidates swept all seven seats in the 1974 election. Larry A. Conrad, 1970 Election Report of Indiana 34; Larry A. Conrad, 1974 Election Report of Indiana 61. Although the first version of the Statute made no provisions for ballot access by third-party, independent, or write-in candidates, a subsequent amendment explicitly permitted minor-party and independent candidates to run in the general election. Pub. L. 315-1977, § 3, 2 Laws of the State of Indiana 1458 (1977).

A candidate for Marion Superior Court Judge may gain access to the general election ballot in one of four ways. First, a candidate may gain access through the primary election process. Parties whose candidates for Indiana Secretary of State received at least ten percent (10%) of the votes cast in the last general election are eligible to hold primaries. Since at least 1952, only the Republican and Democratic parties have met this threshold. Because Indiana uses a closed primary system, a voter may only vote in a primary election:

> (1) if the voter, at the last general election, voted for a majority of the regular nominees of the political party holding the primary election; or
>
> (2) if the voter did not vote at the last general election, but intends to vote at the next general election for a majority of the regular nominees of the political party holding the primary election;
>
> as long as the voter was registered as a voter at the last general election or has registered since then.

Ind. Code § 3-10-1-6. Thus, only voters who have voted or intend to vote for a majority of candidates from one of the two major parties may vote in that party's primary. A candidate must file a declaration of candidacy between early January and early February of the year of the primary election to be placed on the primary election ballot. The candidate's party affiliation is then determined either by how the candidate voted in the

last Indiana primary or by the county chair who can certify that the candidate is a member of that party. Ind. Code §§ 3-8-2-4, -5, -7.

Pursuant to the Statute, a political party may nominate candidates for no more than half of the eligible seats on the Marion Superior Court. Accordingly, for those years in which sixteen positions are at stake, a party may nominate—by way of a primary election—only eight candidates for the general election. In years with twenty positions at stake, a party may nominate only ten candidates. In the general election, the candidates then run at large rather than as a candidate for judge of a particular room or division of the court.

Second, a minor political party "whose nominee received at least two percent (2%) but less than ten percent (10%) of the votes cast for Secretary of State at the last general election" may nominate judicial candidates through a state convention. Ind. Code § 3-8-4-10. Once nominated, the candidates proceed to the general election ballot. Third, an independent candidate or a candidate of a political party whose candidate did not receive two percent (2%) of the votes cast for Secretary of State in the last election may file a certified petition containing the signatures of at least two percent (2%) of the total votes cast in the last election for Secretary of State in Marion County. Finally, a person may file a declaration of intent to be a write-in candidate. However, write-in candidates cannot declare party affiliation with any political party that had received two percent (2%) of the vote for Secretary of State in the last election. Ind. Code §§ 3-8-2-2.5, 3-8-4-1. Thus, a write-in candidate must be either an independent or from a minor

political party that received less than the required two percent (2%).

Since the current version of the Statute went into effect on March 24, 2006, there have been four judicial elections for the Marion Superior Court. In each of these elections, the total number of candidates on the general election ballot equaled the total number of available seats, by virtue of each major party's ability to nominate candidates for only half of the available seats. As a result, every candidate ran unopposed and all of the nominees from both major parties were elected—an even split between the Republicans and the Democrats. No independent or third-party candidates appeared on the ballot. Although the general elections were uncontested, there were more Democratic and Republican candidates seeking each party's nomination, resulting in contested primary elections within each major party's respective primary.

In the forty years that the Partisan Balance Statute has been on the books, there have been only two elections where an alternative candidate, that is, not a Republican or Democrat, appeared on the general election ballot. Five candidates from the Libertarian Party appeared on the ballot in 2000 and one Libertarian candidate appeared on the ballot in 2002.[4] While the Libertarian party candidates were able to access the general election ballot, they presented little challenge to the candidates from the two major parties, who won with overwhelming

---

[4]  We need not haggle over the precise differences between the earlier versions of the Statute—in effect at the time of both elections—and the current version of the Statute, because the recurrent goal present in all versions has been to maintain partisan balance on the court.

support. Thus, in every election since the State adopted the Partisan Balance Statute, the Republican and Democratic parties have each nominated candidates for half of the open seats on the Marion Superior Court. In every general election, all of the Republican and Democratic nominees were elected.

Common Cause Indiana, the Plaintiff/Appellee, challenges the constitutionality of the Partisan Balance Statute under the First Amendment and 42 U.S.C. § 1983. The Defendants/Appellants, collectively referred to as "the State," defend the Partisan Balance Statute as a constitutional exercise of its power to regulate elections. The parties filed cross-motions for summary judgment before the district court, which denied the Defendant's motion but granted the Plaintiff's motion, finding that "the challenged Statute, Indiana Code § 33-33-49-13(b), is invalid on its face—i.e., in all its applications." The district court permanently enjoined the State from enforcing the Statute, but stayed its ruling pending a final determination by this Court.

## II. ANALYSIS

We review de novo a district court's decision to grant summary judgment. *Advance Cable Co., LLC v. Cincinnati Ins. Co.*, 788 F.3d 743, 746 (7th Cir. 2015). As with any summary judgment motion, we "construe all facts and draw all reasonable inferences in favor of the non-moving party" when reviewing cross-motions for summary judgment. *Id.* Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.'" *Burdick v. Takushi*, 504 U.S. 428, 441 (1992) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)); *see also Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 179 (1979) ("[V]oting is of the most fundamental significance under our constitutional structure."). However, States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl.1, and the Supreme Court has recognized that States retain the power to regulate their own elections. *Burdick*, 504 U.S. at 433; *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986). Thus, "'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Id.* (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

A state election law, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). To subject every voting regulation to strict scrutiny would "tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. Therefore, we must apply a "more flexible standard" when considering a challenge to a state election law, and must weigh:

> "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Id.* at 434 (quoting *Anderson*, 460 U.S. at 789)). This balance means that, if the regulation severely burdens the First and Fourteenth Amendment rights of voters, the regulation "must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289, (1992)). When the state election law "imposes only 'reasonable, nondiscriminatory restrictions' upon the rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788)). We apply this standard in considering Common Cause's challenge to the constitutionality of the Statute.

### A. Severity of the Burden on the Right to Vote

Common Cause contends that the Statute imposes a severe burden on the right to vote. Essentially, Common Cause contends that the Statute works exactly as intended—it ensures that all candidates nominated by the two major parties, the Republicans and the Democrats, will be elected in an uncontested general election, guaranteeing partisan balance between the parties. Therefore, voters are denied an effective and

meaningful vote because their vote is irrelevant to the outcome of the general election. The State maintains that the Partisan Balance Statute does not burden the right to vote, or if it does, that such a burden is justified by the State's regulatory interests—namely, to ensure partisan balance on the Marion Superior Court—and that the constitutional right that Common Cause seeks to assert is illusory.

The central issue in this case is whether the Statute burdens "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *see also Burdick*, 504 U.S. at 441 ("[T]he right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system.") In particular, we must consider how the Statute's restrictions on the number of seats each party may seek burdens the right of voters to have an effective voice in the general election. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986) ("Restrictions upon the access of political parties to the ballot impinge upon the rights of individuals to associate for political purposes, as well as the right of qualified voters to cast their votes effectively."); *Anderson*, 460 U.S. at 787–88 (the "exclusion of candidates … burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day."); *id.* at 787 ("The right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.'").

In *Storer v. Brown*, the Supreme Court discussed the correlation between primary elections and general elections and their relationship to the voters' selection of the ultimately successful candidate, noting that:

> The direct party primary … is not merely an exercise or warm-up for the general election but an integral part of the entire election process, the initial stage in a two-stage process by which the people choose their public officers. It functions to winnow out and finally reject all but the chosen candidates.

415 U.S. 724, 735 (1974) (recognizing California's compelling interest in maintaining the integrity of its political processes and upholding California's statutory provisions that denied ballot access to an independent candidate if the candidate had been affiliated with any political party within one year prior to the immediately preceding primary election). Here, the Statute preserves the role of the primary election as the first stage of the election process, whereby "contending forces within a party employ the primary campaign and primary election to finally settle their differences" and select their nominee for the general election. *Id.* In the normal course, the general election would then give the full electorate the opportunity to consider and choose between the available candidates, *id.* ("The people, it is hoped, are presented with understandable choices and the winner in the general election with sufficient support to govern effectively."), but the Statute does not contemplate a contested general election. Instead, the Statute burdens the vote by essentially removing all competition and electoral choice

before the general election, severely undercutting the second stage of the "two-stage process by which the people choose" the judges for the Marion Superior Court.

In order to achieve partisan balance, the Statute restricts the two major parties' access to the general election ballot by prohibiting them from nominating candidates for more than half of all available positions. In effect, this guarantees that the two major parties cannot compete against each other in the general election. Stated differently, the Statute removes electoral choice and denies voters any effective voice or ability to choose between candidates of the two major parties. In fact, absent a possible third party or independent candidate on the ballot, the general election is guaranteed to be uncontested, rendering any vote meaningless because there is no choice to be made. It is of no consequence whether voters approve or disapprove of the candidates. So long as each candidate votes for himself or herself, as he or she presumably will, actions taken by other voters in the general election are meaningless, as they lack any opportunity to affect the outcome. The candidate will win, whether he gets a vote from every voter or no voters at all.[5] Thus, the winning candidates for judge have

---

[5] A prime example of the predetermined nature of the general election is a blog post from the Indiana Law Blog, dated two months *before* the general election, that listed the changes in the Marion Superior Court assignments, effective January 1, 2015, including the yet unelected judicial candidates. *Ind. Courts—Changes in Marion County Court Assignments*, Indiana Law Blog (Sept. 5, 2014, 4:18 PM), http://indianalawblog.com/archives/2014/09/ind_courts_chan_16.html; *see also Marion County Court Assignments Made for 2015*, Indianapolis Bar Association, (Sept. 10, 2014),

(continued...)

effectively been determined in the primary election without the participation of the full electorate, because all the major party nominees who successfully obtained their parties's nomination are virtually guaranteed to win, with an even split between the parties.[6]

According to the State, there is no constitutional right to a contested election, nor a right to vote for a preferred party candidate for every available seat in an election. To support its position, the State relies on *New York State Board of Elections v.*

---

[5] (...continued)
http://www.indybar.org/news/indybar-news/ 2014/271 (showing the court assignments to the Marion Superior Court decided by the Marion County Executive Committee, including the new judge assignments in the criminal courts).

[6] Considering that the party primary elections are often contested, the Statute allows major party voters the ability to effectively cast a vote for half (and only half) of the available seats in their party primary. However, if the party's leadership agrees on the slate and no other potential judicial candidates seek to challenge the slate, resulting in an uncontested primary, there would be no electoral choice in the primary as well. Voters who cannot vote in a primary would have no opportunity to cast an effective or meaningful vote. That primary voters generally have the ability to at least effectively vote for half of the candidates, by virtue of them running unopposed in the general election, as opposed to voters who cannot vote in the primary and have no effective vote, also raises concerns about the equality of their votes. *See Williams*, 393 U.S. at 30 (noting "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively"); *see also Reynolds v. Sims*, 377 U.S. 533, 579 (1964) (establishing the principle of "one person, one vote" and finding that electoral districts must be substantially equal in population "so that the vote of any citizen is approximately equal in weight to that of any other citizen").

*Lopez-Torres*, 552 U.S. 196 (2008), which involved a First Amendment challenge to New York State's system for electing Supreme Court (trial court) justices. In *Lopez-Torres*, the plaintiffs challenged New York's "delegate primary" convention system, in which each party nominated a single candidate to run for each judicial seat. *Id.* at 200–01. Despite this allowance, many of the races were uncontested because only one of the major parties chose to nominate a candidate, apparently because the other party decided it was not worth the time and effort to present a challenger. *Id.* at 207–08. The plaintiffs unsuccessfully sought their party's nomination and brought a First Amendment claim alleging deprivations of their rights to ballot access and political association and arguing for the right to challenge the candidates favored by party leadership through a primary election. *Id.* at 201.

The Supreme Court held that New York's electoral system for Supreme Court judges did not violate the plaintiffs' First Amendment rights to political association and ballot access. In particular, the Court determined that the plaintiffs' real complaint was that the election process did not give them a realistic chance to secure the party's nomination because party leadership enjoyed greater support and was able to garner more votes for its delegate slate in the convention. *Id.* at 204–05 (noting that none of the Court's precedent establishes a constitutional right to a "fair shot" at winning a party's nomination). Further, the Court dismissed the plaintiffs' argument that the entrenched "one-party rule" in the state's general election demanded that the First Amendment be used to impose additional competition in the parties' nominee-selection process. *Id.* at 207–08 (declining to impose a

primary election and noting that while "[c]ompetitiveness may be of interest to the voters in the general election, … those interests are well enough protected so long as all candidates have an adequate opportunity to appear on the general-election ballot").

Despite the State's comparisons, there are important differences in the facts of *Lopez-Torres* that distinguish it from the case at hand. First, the statute in *Lopez-Torres* allowed for each party to nominate one candidate for every available seat in the general election, whereas here the Statute prohibits the major parties from nominating candidates for more than half of the available seats. Second, although the plaintiffs in *Lopez-Torres* were unsuccessful in securing their party's nomination in the convention, they could still get on the general election ballot by providing the requisite number of signatures of voters residing in the district. *Id.* at 207–08. Here, any candidate who fails to secure the party's nomination in the primary is restricted from access to the general election ballot.[7]

Third, although many races in the general election went uncontested in *Lopez-Torres*, this was the result of private decisions in electoral politics, where, for example, the Republican party chose not to run a candidate in a heavily Democratic district, or vice versa, after assessing its chance for victory. *See*

---

[7] In Indiana, any person who is defeated in a primary election or nominating convention is not eligible to be a candidate for the same office in the general election. Ind. Code § 3-8-1-5.5 (noting the exception, found in § 3-13-2-10, whereby a defeated candidate may be appointed by his own political party to fill any vacancy on the party's ticket as a candidate in the general election).

*id.* (noting that one-party entrenchment was the result of voter approval of the positions and candidates of that party within a voting district and the opposing party's choice not to run a challenger). Each party still enjoyed the opportunity to field a candidate for each available position. Here, the Statute structurally guarantees that there will be no competition between the two major parties in the general election. Unlike *Lopez-Torres*, the parties are restricted from access to the ballot as to half of the seats. "The States can, within limits, … discourage party monopoly[, but] [t]he First Amendment creates an open marketplace where ideas … may compete without government interference." *Lopez-Torres*, 552 U.S. at 208 (citation omitted). Critically, the uncontested elections in *Lopez-Torres*—and the lack of electoral choice for voters—was the result of electoral politics within the market. Here, the State interferes with the market by restricting each major party's access to only half of the ballot, an act that "impinge[s] upon the rights of individuals to associate for political purposes, as well as the right of qualified voters to cast their votes effectively." *Munro*, 479 U.S. at 193.

When an election law reduces or forecloses the opportunity for electoral choice, it restricts a market where a voter might effectively and meaningfully exercise his choice between competing ideas or candidates, and thus severely burdens the right to vote. The State contends that where the Supreme Court has referenced a right to a meaningful or effective vote, it has been in the context of a right to vote in a system where candidates have reasonable access to the ballot. The State argues that the Statute provides an adequate opportunity to place independent and third-party candidates on the ballot,

and that if voters wish to have a contested general election, it is their responsibility to field independent and third-party candidates to contest those seats.[8] However, the possibility that an independent or third-party candidate appears on the ballot can only impact the last seat selected.[9] It does not alter the fundamental nature of the Statute—to reduce electoral choice and the availability of what would otherwise be contested elections in the interest of preserving partisan balance.[10] When a voter's lack of electoral choice in an election is the consequence of electoral politics and private decisions without government interference, it is merely a function of the marketplace at work. However, where the electoral scheme interferes with the marketplace by restricting the number of candidates a party may nominate, and thus hinders electoral choice by

---

[8]  The State contends that the system created by the Statute is more favorable to independent and third-party candidates because they only have to compete against one of the major parties, as opposed to both.

[9]  For example, if one independent or third-party candidate appears on the ballot, only the last seat selected will be contested.

[10]  We find it relatively insignificant that a third-party successfully gained access to the general election ballot in 2000 and 2002, challenging five seats and one seat, respectively. The third-party showing was so weak as to not be competitive. The worst performing major party candidate, and last individual voted in, received more than three times the number of votes of the best performing third-party candidate (96,093 to 31,760 votes, respectively). State of Indiana 2000 Election Report, Supp. App. 14. In addition, a significant number of seats were still uncontested, as contemplated by the Statute outside the extremely rare and seemingly unlikely possibility that an independent or third-party candidate is on the general election ballot.

which voters would have the opportunity to choose between competing alternatives that would have otherwise existed, the State has severely burdened the voter's ability to cast a meaningful and effective vote.

## B.  The Interests of the State

Having determined that the Statute places a severe burden on the right to vote, we must now consider "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789)).

### i. Ensuring Fair Political Representation and Impartiality

The State asserts that the "Supreme Court has held that partisan balance provisions are reasonable, nondiscriminatory restrictions justified by the State's important regulatory interest in ensuring fair representation." Br. at 16 (arguing that there is no constitutional right for a party to nominate a candidate for every available position or to sweep an election). The State presents three cases in support of this proposition.

In *Blaikie v. Power*, 193 N.E.2d 55 (N.Y. 1963), the plaintiffs challenged the procedure for electing members to the New York City Council, which provided that two councilmen were elected at-large from each borough, but that each party could nominate only one candidate per borough and each voter could cast only one vote per borough. *Id.* at 56. This system of

voting, known as "limited voting," was developed "in order to make possible the election of minority representatives," but the plaintiffs alleged their ability to vote for only one candidate deprived them of "a right to vote for a candidate of his choice for both of the elective offices to be filled," an offense against the State Constitution. *Id.* New York's highest court upheld the procedure, finding that, in the context of New York's Constitution, limited voting and proportional representation were identical in substance and effect, and that "each system necessarily involves a limitation of voting, imposed on all voters alike, in order to make possible of achievement some minority representation in a multiple body." *Id.* at 59.

In *LoFrisco v. Schaffer*, 341 F. Supp. 743 (D. Conn. 1972), *aff'd*, 409 U.S. 972 (1972), the plaintiff challenged a limited voting scheme for school board elections in which a "town committee or caucus" could nominate candidates for only half of the vacancies on the board, or a bare majority if an odd number, and set the maximum number of individuals of the same political party who may sit on the board to two-thirds.[11] *Id.* at 746. Although the statute did not limit the number of candidates who could run, it required the town clerk to disregard other majority party candidates once the majority reached its limit even if they had more absolute votes than the minority party candidates who would be elected. The court upheld the restrictions, finding that the legislature's minority representation scheme to ensure that boards "have a significant minority

---

[11] Depending upon the size of the board, the majority party may occupy no more than 2 of 3, 3 of 4, 4 of 5, 5 of 7, and two-thirds of 9 of more seats on the board. *Id.* at 746.

voice, to air and introduce ideas which the majority might not otherwise consider" was not a violation of the Fourteenth Amendment. *Id.* at 750. Although the plaintiff "essentially argue[d] that the majority's vote is diluted because it is not allowed to elect as many members as it could were it free to take an unlimited number of seats on the board," the court determined that, "so long as there is no invidious discrimination against any individual or group's right to cast votes on an equal basis with all others," it was not a violation for the legislature to insure that "all points of view" were represented on the board. *Id.* at 749–50.

In *Hechinger v. Martin*, 411 F. Supp. 650 (D.D.C. 1976), *aff'd*, 429 U.S. 1030 (1977), the plaintiffs challenged a law that limited a party to nominating only two candidates for the four at-large seats on the District of Columbia Council. The court considered "whether the Constitution requires that the political party with the majority of registered voters must have the right in an election for a multi-member body to elect all the members of that body." *Id.* at 652. The court concluded that the provision preventing a party from nominating candidates for all available seats was not a violation. *Id.* at 653 ("The concept of minority representation, or stated in another fashion, limitations on majority representation, is entirely consistent with First Amendment principles of freedom of expression and association, and appears altogether legitimate as a legislative objective."). In particular, the law's "purpose and effect [wa]s to ensure that political minorities are represented on the Council and that dissident voices are heard in the legislative process," a purpose that is entirely harmonious with that of the First Amendment. *Id.* at 654.

According to the State, these cases establish that election laws intended to ensure balanced political representation are fully consonant with the First and Fourteenth Amendments.[12] However, the State's rationale does not address a crucial difference from the facts presented—those cases speak to an interest in protecting minority party representation in the context of multi-member or legislative bodies. *See, e.g.*, *Hechinger*, 411 F. Supp. at 654 (noting that "the purpose of the [minority representation provision] was entirely harmonious with that of the First Amendment" because it provided "fair and equitable protection of minority interests" by "ensur[ing]

---

[12] Although the State contends that these cases are binding precedent for the proposition that partisan balance provisions are constitutional, we find that these cases are instructive only to the issue presented within those cases. The Supreme Court summarily dismissed the appeal in *Blaikie* for want of a substantial federal question, *Blaikie v. Power*, 375 U.S. 439 (1964) (per curiam), which became a disposition on the merits. *See Hicks v. Miranda*, 422 U.S. 332, 344 (1975). However, the decision upholding the statute was based upon the New York State Constitution and is not controlling. Both *LoFrisco* and *Hechinger* were summarily affirmed by the Supreme Court. *LoFrisco v. Schaffer*, 341 F. Supp. 743 (D. Conn. 1973), *aff'd*, 409 U.S. 972 (1972); *Hechinger v. Martin*, 411 F. Supp. 650 (D.D.C. 1976), *aff'd*, 429 U.S. 1030 (1977). Although a summary disposition "prevent[s] lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions," it is not binding when the "facts are very different from the facts of [the present] case." *Mandel v. Bradley*, 432 U.S. 173, 176–77 (1977); *see also Hicks*, 422 U.S. at 344 (summary dispositions are no longer binding precedent when "doctrinal developments" indicate they should not be followed). In addition to various factual differences, the subsequent case law in *Anderson* and *Burdick* established the proper test for election law challenges. Thus, this case must be considered under its own unique facts and the subsequent doctrinal developments in election law.

that political minorities are represented on the Council and that dissident voices are heard in the legislative process"). Minority representation provisions, or, stated differently, limitations on majority representation, protect against partisanship run amok. A judge, however, is not elected to represent a particular viewpoint but must exercise his or her own independent authority to make decisions that uphold and apply the law fairly and impartially. *See, e.g.*, *Republican Party of Minnesota v. White*, 536 U.S. 765, 803 (2002) (Ginsburg, J., dissenting) ("Whether state or federal, elected or appointed, judges perform a function fundamentally different from that of the people's elected representatives. Legislative and executive officials act on behalf of the voters who placed them in office; 'judge[s] represen[t] the Law.'" (citations omitted)).

The State contends that partisan balance promotes its compelling interest in promoting public confidence in the impartiality of the bench.[13] According to the State, if one party was able to sweep and control all the seats in a judicial election, litigants of other political affiliations would feel as though the odds were stacked against them. Although the State's goal of partisan balance on the Marion Superior Court conjures up notions of fairness, it is an odd concept of fairness in the

---

[13] Stated differently, the State argues that the party label can be read as a substitute for judicial philosophy, in that the major political parties likely have different priorities when nominating candidates and that the Partisan Balance Statute ensures that the court, in the aggregate, represents a diversity of views and judicial philosophies.

judicial context.[14] Public confidence in the impartiality of the court is enhanced when litigants believe a judge will decide the case on the facts and the law without "bias for or against either party to the proceeding." *White*, 536 U.S. at 775 (emphasis omitted).

Indeed, the Indiana Code of Judicial Conduct requires as much. Judges and judicial candidates must "act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Ind. Code of Judicial Conduct R. 1.2. A judge must "uphold and apply the law … fairly and impartially," *id.* R. 2.2, "without bias or prejudice," *id.* R. 2.3(A), and "shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or *political affiliation* … ." *Id.* R. 2.3(B) (emphasis added). "Public confidence in the independence and impartiality of the judiciary is eroded if judges or judicial candidates are perceived to be subject to political influence," *id.* R. 4.1 Cmt. [3], so judges "must, to the greatest extent possible, be free, and appear to be free, from political influence and partisan interests." *Id.* R. 4.1

---

[14] Such a notion of fairness at best gives a litigant an equal chance of getting a judge from a favored party versus a non-favored party, since the Marion Superior Court Local Rules provide for the random assignment of cases among the judges. LR49-TR3-200 (random filing in civil cases); LR49-CR2.2-100 (random assignment of criminal cases).

Cmt. [1]. The Indiana Code of Judicial Conduct permits only narrowly-tailored exceptions to the prohibitions against political activities of judges and judicial candidates, and explicitly acknowledges that judges must serve in a manner different from legislators or executive branch officials. *Id.* ("Even when subject to public election, a judge plays a role different from that of a legislator or executive branch official. Rather than making decisions based upon the expressed views or preferences of the electorate, a judge makes decisions based upon the law and the facts of every case.").

Partisan balance amongst the judges who comprise the court, alone, has little bearing on impartiality. For instance, let's assume that the court included two equally ultra-partisan, biased judges who allowed their political affiliation to influence their conduct and decisions. One judge is partial for Republican interests; the other for Democratic interests. Once the public became aware of the two problem judges, their confidence in the impartiality of the court would not be restored by the fact that the court still has overall partisan balance. Rather, calls would be made for the removal of both judges and their replacement with judges who would fairly and impartially decide cases, regardless of any political affiliation. If the ratio of ultra-partisan, biased judges was extended to 2 to 2, 3 to 3, or even 18 to 18 (comprising the entire court), the public would become increasingly less confident in the impartiality of the court, notwithstanding that the court still enjoys partisan balance between the major political parties. Simply stated, partisan balance can serve as a

check against contrary partisan interests, but it says little about the impartiality of individual members.[15]

Further, we note that the policy reasons offered by the State in support of the Statute—namely, to promote public confidence in the impartiality of the court by preventing one party from sweeping all of the seats—are not supported by the record. The State contends that if one party were to have majority control of the seats on the court, litigants of other political affiliations would feel as though the odds were stacked against them. However, there is nothing in the record to substantiate a claim that partisan balance on the court is necessary to serve that interest, or that such a concern has ever been raised. Even during the 1970 and 1974 elections in which

---

[15] The Statute effectively makes the electoral choice of which candidates will become judges occur in the respective parties' primaries, where only one party's members may participate, and those nominees go on to the at-large general election unchallenged, and unchallengeable, by the other major party. Such a system could be viewed as ultra-partisan, because judicial candidates would only need to appeal to voters within their own party, and not to the general electorate in the general election. Further, if, say, an individual from the other major party disliked a judicial candidate for whatever reason and wanted to exercise his vote to elect someone else instead, he would be powerless to do so under the Statute. He could not vote in support of other candidates in the other party's primary, hoping that the undesired candidate fails to secure the nomination by virtue of being outside the top eight, or ten, candidates, respectively, and he could not vote against the candidate or for others in the general election, for the candidate need only to vote for himself to win in the usual case. Such a system creates the perception that a judge is chosen within the primaries, not the general election, and if a judicial candidate's eventual election is dependent solely on the primary, the candidate's chances of being elected improve the more he appears to espouse the ideals of the party.

each major party swept all of the seats, we are not presented with any evidence that a litigant complained of bias or prejudice on the part of a judge based upon party affiliation, or that all the judges on the court had the same party affiliation. It is asserted that the Statute, and its accompanying burden on the right to vote, is necessary to protect and promote public confidence in the impartiality of the bench, but this presumes that nothing protected these interests before the Statute. The Indiana Code of Judicial Conduct contains numerous rules and provisions designed to ensure the independence, integrity, and impartiality of the court, including detailed restrictions on political activity by judges and judicial candidates. Ind. Code of Judicial Conduct Canon 4 ("A judge or candidate for judicial office shall not engage in political or campaign activity that is inconsistent with the independence, integrity, or impartiality of the judiciary.") Although the Code of Judicial Conduct has gone through revisions over the years, requirements that judges refrain from certain political activities and decide cases impartially, without personal bias or prejudice, predate the Statute. *See, e.g.*, Indiana Code of Judicial Conduct (effective January 1, 1975). Furthermore, complaints about judicial misconduct for violations of the Code may be filed with the Indiana Commission on Judicial Qualifications, which investigates and recommends discipline, where appropriate, to the Indiana Supreme Court.[16]

---

[16] This system is not mere lip service, for the Indiana Supreme Court has been active in enforcing the rules and meting out discipline, up to and including removing judges from the bench. *See, e.g.*, *In re Brown*, 4 N.E.3d 619 (Ind. 2014) (removing a Marion Superior Court Judge from the bench

(continued...)

We disagree that partisan balance in the context of judicial elections improves the public's confidence in an impartial judiciary. The emphasis on partisan balance could just as easily damage public confidence in the impartiality of the court. Similarly, the interest in ensuring minority party representation in the context of administrative or legislative bodies has been sufficient to justify the burden on the right to vote in those contexts, but we fail to see how it is applicable or necessary in the judicial context.

### ii. Cost of Judicial Elections

The State argues that its interest in keeping the cost of judicial elections to a minimum is a compelling reason in support of the Statute. The State contends that the Statute removes the need for judicial candidates to raise and spend large sums of campaign money, which make elections more partisan and rancorous. The State argues that successful

---

[16] (...continued)

after finding forty-six counts of judicial misconduct). The Code of Judicial Conduct not only addresses the interest in the impartiality of the court, it protects it by enforcing discipline for violations. *Id.* at 628 ("Upon finding judicial misconduct, this Court may impose a variety of sanctions, including removal from office. The purpose of judicial discipline is not primarily to punish a judge but to preserve the integrity of and public confidence in the judicial system and, when necessary, safeguard the bench and public from those who are unfit. Any sanction must be designed to discourage others from engaging in similar misconduct and to assure the public that judicial misconduct will not be condoned." citations omitted)).

candidates would likely feel indebted to their donors, creating a perception of bias, and that the Statute "alleviates these concerns by eliminating head-to-head election contests that devolve into nothing more than high-cost partisan battles." Br. at 32. A brief look at the history of elections for the Marion Superior Court under the Statute reveals that it has achieved this desired purpose—the general election has been uncontested. Voters in the general election are presented with a ballot asking them to vote for either 16 or 20 candidates to fill the 16 or 20 available positions in any given election. Half of them are Republicans. Half of them are Democrats. Neither half can challenge the other half, and so long as the candidate votes for himself, he will win. Thus, the State's purported interest in minimizing the cost of judicial elections and achieving partisan balance has succeeded, but at the expense of removing any meaningful vote for the voter in the general election. The major party primaries, however, often are contested and judicial candidates must still raise and spend campaign money as a part of that election.[17] Therefore, we are

---

[17] Candidates attempting to be slated as one of the parties' preferred candidates generally must pay between $12,000 and $14,000 for the opportunity. *See* Indianapolis Star, *Editorial: System for picking judges needs overhaul*, Mar. 19, 2014, *available at* http://www.indystar.com/story/opinion/editorials/2014/03/19/editorial-system-for-picking-judges-needs-overhaul/6626587; Indiana Lawyer, *Marion County slating reform gets new push*, Aug. 29, 2012, *available at* http://www.theindianalawyer.com/marion-county-slating-reform-gets-new-push/PARAMS/article/29543. Although an unslated candidate may still run and prevail in the primary, Indiana law prohibits the distribution of a list endorsing multiple political candidates during a primary election unless all such candidates have given their written

(continued...)

not convinced that the Statute alleviates any concern that candidates might feel indebted to their donors. Indeed, because the substantive portion of the election occurs during the primary, the candidate could consider himself indebted to the party. His best chance at winning the election is to earn a spot on the party's slate of preferred candidates, which may be better accomplished by a partisan appeal to his own party. Thus, he is campaigning for votes within his own party and not for votes in the general election, reducing the general public's ability to learn about the candidate and consider his abilities and ideas within the marketplace of ideas that supports our democratic system. *See, e.g.*, *Anderson*, 460 U.S. at 787–88 ("The exclusion of candidates also burdens voters' freedom of association, because an election is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens.").

Of course, the State can serve its interest in protecting judicial elections from the often contentious and extreme partisanship prevalent in elections for the other branches of government through proper enforcement of the restrictions on political and campaign activities already in place for judicial

---

[17] (...continued)
consent. *Mulholland v. Marion County Election Board*, 746 F.3d 811, 814 (7th Cir. 2014) (noting that the purpose of Indiana Code § 3-14-1-2 is to assist the major parties in promoting their preferred candidates to run in the primary and "who can easily coordinate the paperwork needed to promote a unified slate, and to increase the two parties' influence over the outcome of primary elections"). Therefore, slated candidates are in a more advantageous position compared to other candidates who fail to earn the endorsement of the party leadership.

candidates. See Ind. Code of Judicial Conduct R. 4.1–4.6 (establishing rules prohibiting judicial candidates from engaging in political or campaign activities that are inconsistent with the independence, integrity, or impartiality of the judiciary). Adherence to these restrictions would, necessarily, prevent campaign expenditures on prohibited campaigning elements, thus reducing the cost of judicial elections relative to campaign costs for elections in the other branches of government.

### iii. Stability and Public Confidence

The State contends that partisan balance is critical to ensuring stability and public confidence in the court. The State argues that partisan balance is particularly important in the Marion Superior Court because it accounts for approximately twenty percent (20%) of all cases filed and disposed of in the State each year, many of which have a statewide impact because petitions for judicial review of State agency actions are often filed in Marion County. The State also argues that the Statute ensures stability on the court by removing the possibility that one party could sweep the election. Such a provision is necessary, the State contends, to prevent a turnover such as occurred in the wake of the Watergate Scandal, in which the Republicans swept all of the seats in the 1970 election and the Democrats swept all of the seats in the 1974 election.

These interests provide little justification for the severe burden imposed upon the right to vote, however. We do not see why the fact that the Marion Superior Court ultimately decides a relatively significant percentage of the State's annual

cases, including cases with statewide impact, necessitates a unique electoral system ensuring partisan balance. The Indiana Code of Judicial Conduct applies the same for judges in Marion County as it does for judges in every other county of the State, yet only the Marion Superior Court has a partisan balance requirement. We do not appreciate how a court with comparatively greater influence, by virtue of the quantity of its decisions or their statewide impact, has sufficient interests in partisan balance to justify the severe burden on the right to vote, but that these interests are not present for any other county in the State, or, for that matter, the country. A case in any other jurisdiction is just as important to the litigants, and the judge is under the same obligations to apply the law to the facts of the case. If the State decides that a partisan judicial election is the best-suited system for filling judicial vacancies in a particular jurisdiction, as it of course may, voters must have the opportunity to cast a meaningful vote in that election.

As for the stability of the court, or stated differently, the State's asserted interest in avoiding a sweeping turnover of judicial personnel, this interest may be served in ways that do not necessarily burden the right to vote. For example, the current version of the Statute already provides for staggered elections, a procedure that allows the State to avoid a complete turnover in any one election that might upset the operation of the court without restricting voters' opportunity to exercise their voice as to which candidates should fill the open positions.

In balancing the asserted injury to the plaintiff with the interests of the State, "the Court must not only determine the legitimacy and strength of those interests; it also must consider

the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789. In light of the burden placed upon the right to vote, the interests put forward by the State do not justify the burden. In the context of partisan judicial elections, the interests identified by the State can either be served through other means, making it unnecessary to burden the right to vote, or those interests are not strong enough to overcome the burden. We conclude that the precise interests put forward by the State do not justify the burden placed on the right to vote for judicial candidates for the Marion Superior Court. Therefore, the Statute violates the First and Fourteenth Amendments.

### III. CONCLUSION

We agree with the district court that the Statute at issue burdens the right to cast a meaningful vote without sufficiently weighty interests to justify such a burden. In the context of partisan judicial elections, which the State has chosen to adopt as its preferred system for selecting judges for the Marion Superior Court, the asserted benefits and interests surrounding partisan balance do not justify the burden placed on the right to vote. The judgment of the district court is AFFIRMED.