In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-2350

GREGORY BOWES AND
CHRISTOPHER K. STARKEY,

*Plaintiffs-Appellants,*

*v.*

INDIANA SECRETARY OF STATE, *ET AL.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:14-cv-01322-RLY-DML — **Richard L. Young**, *Chief Judge*.

ARGUED SEPTEMBER 8, 2016 — DECIDED SEPTEMBER 21, 2016

Before FLAUM, ROVNER, and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. Plaintiffs Gregory P. Bowes and
Christopher K. Starkey lost in the May 2014 Democratic pri-
mary election for Marion County Superior Court judges. A
few months later, and just before the general election, the dis-
trict court for the Southern District of Indiana held that the
statute establishing the system for the election of such judges,

Indiana Code § 33–33–49–13, was unconstitutional. That decision was affirmed by this Court. Plaintiffs then sought a special election, which they argued was the only way to vindicate their constitutional rights. The district court held that a special election was not appropriate and granted defendants' motion for summary judgment. For the reasons that follow, we agree and affirm.

## I. Background

On November 1, 2012, approximately a year and a half before Indiana's primary election, Common Cause Indiana, a bipartisan nonprofit organization, filed suit seeking a declaration that Indiana's method of electing Marion Superior Court judges violated its members' First Amendment right to cast a meaningful vote. The challenged statute, Indiana Code § 33–33–49–13 ("the Statute"), established the system for electing judges to the Marion Superior Court, and provided at section (b) that a political party could not nominate through the primary election process more than half of the candidates eligible to sit on the Marion Superior Court. Political parties eligible to hold primaries were those whose candidates for Indiana Secretary of State received at least ten percent of the votes cast in the last general election; since at least 1952, only the Republican and Democratic parties have met this threshold. *Common Cause Ind. v. Individual Members of the Ind. Election Comm'n*, 800 F.3d 913, 915 (7th Cir. 2015).[1] Because the primary election process was the only way for candidates from

---

[1] Candidates with non-major political party affiliation could gain access to the general ballot in different ways. A "minor" political party could nominate judicial candidates through a state convention; an independent candidate, or a candidate with less support than a minor political party

major political parties to access the general election ballot, the law effectively limited the candidates that could ultimately be selected by the voters.[2] Marion County was the only place in the country to employ an election process of this kind. *Id.* at 914.

On May 6, 2014, while the *Common Cause* litigation was pending, Marion County held its primary election. That year, there were sixteen open positions for the Marion Superior Court.[3] Eleven Democratic candidates (including plaintiffs Bowes and Starkey) and eight Republican candidates ran. Plaintiffs spent almost no effort campaigning for the primary election and did poorly: Starkey finished last in eleventh place

candidate, could file a certified petition; and finally, a candidate unaffiliated with any party that received 2% of the vote for Secretary of State in the last election could file a declaration of intent to be a write-in candidate. *Common Cause Ind.*, 800 F.3d at 915 (citing Ind. Code §§ 3–8–2–2.5, 3–8–4–1, 3–8–4–10).

[2] Since the current version of Indiana's election law went into effect in 2006, there have been four judicial elections, and in each, the total number of candidates equaled the total number of available seats. That is, all of the nominees consisted of candidates from the two major parties, and every Democratic and Republican candidate ran unopposed (and, due to the Statute, an even split of Democrats and Republicans was elected). *Common Cause Ind.*, 800 F.3d at 915–16. In the forty years since Indiana introduced this election process, there have only been two elections where a non-major party candidate appeared on the ballot, and none has been elected into office. *Id.* at 916.

[3] The thirty-six judges of the Marion Superior Court are elected to six-year terms beginning on January 1 after the year of each judge's election. These terms are staggered, such that sixteen of the thirty-six judges serve for terms beginning in 2006 (and then 2012, 2018, and so forth), and the other twenty judges serve for terms beginning in 2008 (and then 2014, 2020, and so forth). *Common Cause Ind.*, 800 F.3d at 914.

with 5,698 votes, and Bowes came in tenth with 8,551 votes. Under the Statute, only eight Democratic and eight Republican candidates could qualify for the general election, so plaintiffs' names were not included on the ballot.

Four days before the primary election, Starkey had filed a motion to intervene in the *Common Cause* litigation. Starkey's motion requested an injunction requiring his placement on the general election ballot. On June 18, 2014, the magistrate judge denied Starkey's motion because Common Cause had not sought injunctive relief, and the court decided that it was not proper to allow Starkey to change the course of the litigation at that late stage. The magistrate judge also determined that Starkey lacked an interest in the litigation such that it would be impaired without his participation.

Two months later, and less than three months before the upcoming general election, on August 11, 2014, Bowes and Starkey filed a suit challenging the constitutionality of the Statute in the Indiana district court. Plaintiffs again requested injunctive relief requiring the State of Indiana to place them on the ballot for the November 4, 2014 general election.

On October 9, 2014, the district court resolved the *Common Cause* litigation, holding that the Statute was facially unconstitutional. *See Common Cause Ind. v. Ind. Sec'y. of State, et al.*, 60 F. Supp. 3d 982 (S.D. Ind. 2014). The district court reasoned that the Statute severely burdened the right to vote without furthering important state interests. *See id.* at 991. The court permanently enjoined the state from enforcing the Statute, but stayed the ruling pending a final determination from this Court. We affirmed that decision on September 9, 2015. *Common Cause Ind.*, 800 F.3d at 914, 928.

On November 7, 2014—after the district court had issued its opinion in *Common Cause*, but while the appeal was still pending, and three days after the November 4, 2014 general election—plaintiffs filed in their own suit a motion for leave to file an amended complaint reflecting the district court's ruling in *Common Cause* and adding two new defendants: the Marion County Clerk and the Marion County Election Board.[4] The district court granted that motion. The amended complaint asked the court to void the results of the 2014 general election for Marion Superior Court Judge and order defendants to hold a special election. Specifically, plaintiffs requested that the district court unseat the sixteen superior court judges elected in the 2014 general election so that a special election could be held at the same time as the regularly scheduled general election on November 8, 2016.[5] Under plaintiffs' proposed special election, only the nineteen candidates who were on the primary ballot in 2014 would be placed on the special election ballot in 2016.

The parties filed cross motions for summary judgment, and the district court granted defendants' motion. The district court relied on our case law characterizing the remedy of a special election as "an extraordinary remedy which the courts should grant only under the most extraordinary of circumstances." *See Bowes v. Ind. Sec'y of State*, No. 1:14-cv-013220-RLY-DML, 2016 WL 2894436, at *3 (S.D. Ind. May 18, 2016)

---

[4] The original defendants were the Indiana Secretary of State, the Indiana Election Commission, and the Governor of Indiana.

[5] Because a Marion Superior Court judge's term lasts for six years and the elections are staggered, no Superior Court judges were up for reelection in 2016.

(quoting *Gjersten v. Bd. of Election Comm'rs for City of Chi.*, 791 F.2d 472, 478 (7th Cir. 1986) (internal citation and quotation marks omitted)). Considering the equitable factors set forth in *Gjersten*, the district court determined that plaintiffs' filings were not sufficiently timely and highlighted the "significant burden a special election would have on the Marion County judiciary, the candidates, the Marion County Clerk, the Marion County Election Board and its volunteers, and the county as a whole." *Bowes*, 2016 WL 2894436, at *2–4. This appeal followed.

## II. Discussion

On appeal, plaintiffs argue that the district court erred by refusing to order a special election. They contend that their suit was timely because Starkey had moved to intervene in the *Common Cause* suit before the primary election, and because plaintiffs had filed their own suit several months before the general election. They also argue that the district court ignored certain equitable factors that weighed in their favor and overstated the degree to which holding a special election would burden the county.

### A. Standard of Review

As an initial matter, the parties disagree on the appropriate standard of review. Although plaintiffs are correct that we review denials of summary judgment *de novo*, this case involves a request for equitable relief. We have explained that it is appropriate to "give great deference to the district court's decision as to the precise equitable relief necessary in a particular case." *Gjersten*, 791 F.2d at 479. Although the district court did not grant the requested equitable remedy of a spe-

cial election, there is no reason that a decision to deny equitable relief would be evaluated under a different standard. Accordingly, we review the district court's decision to deny equitable relief for an abuse of discretion. *See id*.; *Harper v. City of Chi. Heights*, 223 F.3d 593, 601 (7th Cir. 2000) ("Appellate review of a district court's choice of remedy in a voting rights case is for abuse of discretion.") (citation omitted).

### B. Equitable Factors

In denying plaintiffs' request for a special election, the district court considered the equitable factors that we set forth in *Gjersten*. In *Gjersten*, the district court declared unconstitutional a law mandating differing signature thresholds for ward committeeman candidates and township committeeman candidates. In addition to invalidating the law, the court ordered special elections in specified wards. On appeal, we affirmed the decision holding the law unconstitutional, but reversed the determination that special elections were warranted. We explained that imposing a special election is a "drastic remedy," 791 F.2d at 473, and found that the district court had not given enough consideration to the equitable factors underlying the decision:

> The remedy of a special election has been described by courts as "drastic if not staggering," and as an "extraordinary remedy which the courts should grant only under the most extraordinary of circumstances." A federal court reaching into the state political process to invalidate an election necessarily implicates important concerns of federalism and state sover-

eignty. It should not resort to this intrusive rem-
edy until it has carefully weighed all equitable
considerations.

*Id.* at 478 (citations omitted).

*Gjersten* did not set forth a precise test for determining
when a special election is appropriate. Instead, we explained
that each case must be examined individually. We highlighted
the importance of "carefully consider[ing] both the integrity
of the electoral system and the necessities of the process of
governing," and in doing so, assessing whether "the plaintiffs
filed a timely pre-election request for relief." *Id.* at 479. We
elaborated that "[t]he court must … require the plaintiffs to
demonstrate that the unconstitutional practice had a signifi-
cant impact on the particular election they seek to have de-
clared invalid." *Id.* Finally, we explained that "[i]f the plain-
tiffs establish that they pursued their rights in a timely fashion
and that the election is suspect, the court must balance the
rights of the candidates and voters against the state's signifi-
cant interest in getting on with the process of governing once
an electoral cycle is complete." *Id*. On our review of the equi-
table factors in this case, we conclude that the district court
did not abuse its discretion in denying plaintiffs' request for a
special election.

The district court first found that plaintiffs' request for re-
lief was not timely because they filed their complaint and re-
quest for a preliminary injunction only three months before
the 2014 general election, and filed an amended motion for a
preliminary injunction on October 15, 2014—nine days after
early voting in the general election had begun. Plaintiffs argue
that because they filed suit eighty-five days before the general
election, and Starkey had moved to intervene in the *Common*

*Cause* litigation six months before the general election (and days before the primary election), the request for relief was timely.

The district court's conclusion that plaintiffs' request for relief was untimely is reasonable. In *Gjersten*, we explained: "Admittedly, it is not always easy to determine whether the plaintiffs have made a timely attempt to protect their rights. Timeliness must be judged by the knowledge of the plaintiffs as well as the nature of the right involved." *Id.* at 480 n.12. Thus, we must consider the fact that plaintiffs were aware of the *Common Cause* suit when it was filed in November 2012, became primary candidates in early February 2014, and did not file suit to vindicate their rights until August 2014, two months after losing the primary election. Although Starkey had moved to intervene in the *Common Cause* case in May 2014, which was three months after declaring his candidacy (and two days before the primary election), he (and Bowes) waited until two months after losing the motion in June 2014 to file this suit—even though they knew that the general election was fast approaching.

Though plaintiffs' efforts may not be egregiously late, *Gjersten* teaches that context matters, and that plaintiffs in general must act quickly once they become aware of a constitutional violation, so as not to disrupt an upcoming election process. *See id.* ("When circumstances permit, a district court should be afforded sufficient time in advance of an election to rule without disruption of the electoral cycle."); *see also Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) ("Laches arises when an unwarranted delay in bringing a suit or otherwise pressing a claim produces prejudice to the defendant. In the context of elections, this means that any claim against a state

electoral procedure must be expressed expeditiously. As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made. The candidate's … claim[] to be … a serious candidate … with a serious injury become[s] less credible by their having slept on their rights.") (citations omitted).

Plaintiffs argue that they had until September 8, 2014 to timely file a suit, because under Indiana Code § 3–10–8–8(a), the earliest a special election may occur is nine weeks after it is ordered by a court. Plaintiffs contend that the court could immediately have ordered the special election to take place on the same date as the general election. This argument ignores the fact that it is a near impossibility for a court to rule on a suit the same day it is filed. In any event, we do not need to establish an endpoint for the timely filing of a suit, as the inquiry depends on the specific facts of each case. Under the facts here, the district court reasonably concluded that plaintiffs' suit was untimely. *See Morton v. Smith,* 91 F.3d 867, 870 (7th Cir. 1990) ("A decision constitutes an abuse of discretion when it is not just clearly incorrect but downright unreasonable.") (internal quotation marks omitted).

The district court next considered whether plaintiffs had demonstrated "that the unconstitutional practice had a significant impact on the particular election they seek to have declared invalid." *Bowes,* 2016 WL 2894436, at *3 (quoting *Gjersten*, 791 F.2d at 479). The district court concluded that to the extent plaintiffs could show such an impact, they would still be unable to overcome the significant burden that holding a special election would pose on Marion County.

Although we have not expounded on this equitable factor, it is clear that it is not enough that the unconstitutional law had only *some* impact on the election. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). On the other hand, if plaintiffs can show a "reasonable possibility" that the Statute affected the outcome of the election, that may demonstrate a "significant impact." *Smith v. Cherry*, 489 F.2d 1098, 1103 (7th Cir. 1973). *Hadnott v. Amos*, 394 U.S. 358 (1969), is instructive. In *Hadnott*, state officials barred National Democratic Party candidates, who were mostly African American, from appearing on the ballot through discriminatory enforcement of the election laws. *Id.* at 360. The Supreme Court held that the Alabama election officials' discriminatory enforcement violated the Constitution. *Id.* at 366. In addition, the Court ordered that a special election be held in Greene County, where it appeared that the National Democratic Party candidates would have prevailed had they not been kept off the ballot by the election officials' unconstitutional behavior. *Id.* at 367. In Greene County, 1,938 ballots were marked for the National Democratic Party straight ticket, while the Democratic Party candidates received only 1,699 to 1,709 votes. *Id.* at 361.

Plaintiffs' case is not as compelling as that of the plaintiffs in *Hadnott*. In support of their contention that they "might well have" prevailed over the Republican candidates in the general election, plaintiffs here cite statistics showing that, on average, Republican candidates received fewer votes than Democratic candidates in the last four judicial elections. (Specifically, in the past four elections, the highest-polling Republican candidate elected received, on average, 78.1% of the votes of the lowest-polling Democratic candidate.) This evidence generally shows that Democratic candidates have fared better than Republican candidates, and suggests that a larger

number of Democratic candidates may have been elected in 2014 if not for the Statute. Nonetheless, the fact that Bowes and Starkey spent almost no effort on campaigning weakens their argument that they would have beaten the two lowest-polling Republican candidates and been elected absent the law. At any rate, we need not decide whether plaintiffs have demonstrated a "significant impact" on the election because other equitable factors counsel against ordering a special election.

As discussed, *Gjersten* held that where plaintiffs can show that they made a timely pre-election request for relief and that the unconstitutional provision had a significant impact on the election, "the court must balance the rights of the candidates and voters against the state's significant interest in getting on with the process of governing once an electoral cycle is complete." 791 F.2d at 479. To be clear, the rights at stake here are plaintiffs' right to have their names placed on the ballot and the voters' right to cast a meaningful vote. *Id.*

The district court determined that plaintiffs could not "overcome the significant burden a special election would have on the Marion County judiciary, the candidates, the Marion County clerk, the Marion County election board and its volunteers, and the county as a whole." In particular, the court noted that the Indiana legislature had not yet arrived at a new process for electing judges; that it would be arbitrary to order a special election involving only the judicial candidates from the 2014 election cycle, when all thirty-six judges were elected under the subsequently determined unconstitutional process; that reelection would be disruptive to the administration of justice; and that a special election would burden the

candidates by requiring them to campaign and fundraise in a truncated campaign season.

Plaintiffs disagree that holding a special election would greatly burden Marion County. They contend that if the district court simply ordered the county to hold the special election at the same time as the 2016 general election, there would be little additional expense and minimal voter confusion and disruption. Plaintiffs also claim that any disruption to the judiciary would be minor, as only sixteen out of thirty-six judges would be involved in the special election, and, at most, only three judges would be unseated. Finally, plaintiffs point out that the next judicial election will not occur until 2018, and that the judges elected in 2014 will remain in office until 2020; thus, voters will have to wait several years for a "meaningful election."

A problem with many of plaintiffs' arguments is that their special election proposal is arbitrary by virtue of its limited scope. If the existence of the Statute so tainted the Marion County judicial elections as to warrant a special election, then all of the seats subject to election under the old system should be open for re-election. Limiting the special election to the sixteen seats that were filled in the 2014 election means any unfairness from allowing officials elected under the now determined unconstitutional system to remain in office would persist for several years. Plaintiffs' own proposal thus undermines their argument that it is necessary in the first place to undo any damage created by the unconstitutional election process.

Even if we were to accept plaintiffs' special election proposal involving only sixteen seats, the district court's conclusion about the degree of the burden was reasonable. Indiana

has not yet amended its election procedures, so if we were to require a special election, we would need to specify an election process for Indiana to use in that election, or order that Indiana enact a new constitutional process right away. Either approach would significantly encroach into Indiana's election machinery, which ought to be "a matter for legislative consideration and determination." *Reynolds*, 377 U.S. at 568 (holding that the district court "acted wisely in declining to stay the impending primary election in Alabama, and properly refrained from acting further until the Alabama legislature had been given an opportunity to remedy the admitted discrepancies in the State's legislative apportionment scheme …."); *see also id.* ("[J]udicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so."). And contrary to what plaintiffs contend, the mere fact that Indiana Code §§ 3-10-8-1 discusses holding special elections in certain narrow circumstances does not evince the state's "anticipation" of holding a special election in the case at hand.

The timing of this appeal also exacerbates the burden on the county. If a court-ordered special election were to take place on the same day as the general election (per plaintiffs' proposal), Indiana would have less than three months from the date of oral argument to implement it. It is self-evident that such an order would generate significant costs, as the candidates would likely have to campaign and fundraise, and the government would need to complete all of the necessary notices and paperwork to add names to the ballot in a highly compressed timeframe. If the special election were to take place at a later date, the state and the candidates would have

more time to prepare, but it would likely be even more inconvenient and expensive to reach out to voters again, locate volunteers, advertise, and so forth.[6]

Finally, as the district court observed, opening up the judiciary to a special election would be "highly disruptive to the administration of justice." *Bowes*, 2016 WL 2894436, at *4. The elected judges would have to take time away from their cases and dedicate resources to another campaign. *See Gjerstein*, 791 F.2d at 479 ("Special elections not only disrupt the decision-making process but also place heavy campaign costs on candidates …."). Even if only sixteen judges (out of thirty-six) were affected, this would prove a substantial disruption, as the Marion County judicial system accounts for approximately twenty percent of all cases filed and disposed of in Indiana.

In weighing these burdens against plaintiffs' interest in being placed on the ballot and the voters' interest in casting a meaningful vote, the district court reasonably found that the balance tips against holding a special election. The prospective relief granted by *Common Cause* ensures that all future elections will be held in conformance with the Constitution, protecting from this point forward the voters' interest in cast-

---

[6] On appeal, plaintiffs take issue with certain of the government's arguments as having "no foundation in the record," including the government's assertions concerning the likely cost and burden associated with a special election. Not only did the government raise these same arguments in the district court, where plaintiffs responded to them at length on the merits, but it is common sense that holding a special election, especially in a compressed timeframe, would entail additional cost and effort for both the county and the candidates.

ing a meaningful vote. Although it is possible that the composition of the Marion County judiciary would have been different if not for the unconstitutional law, the Statute's overall impact is minimal. At most, three additional Democratic judges (the two plaintiffs and the ninth-place finisher), comprising nineteen percent of the total number of judges elected in 2014, otherwise would have been elected that year. And importantly, the constitutional violation here did not stem from any discrimination or "invidious or fraudulent intent," *Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir. 1975), but from a misguided effort to assure judicial impartiality. As for plaintiffs' interest in being placed on the ballot, both acknowledge that they did almost no campaigning in the 2014 primary, which illustrates, at least in part, how much they valued that right, and both will have the opportunity to run for office again in the regular election in 2018.

In sum, the district court was within its discretion to conclude that plaintiffs' request for relief was not timely and that the state's significant interest in governing without disruption outweighed plaintiffs' interest in being placed on the ballot.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.